CHIRIKOFF ISLAND CATTLE CORPORA-
TION, a corporation, Appellant,

v.

J. J. ROBINETTE and Aero Enterprises, Inc.,
Appellees.

CHIRIKOFF ISLAND CATTLE CORPORA-
TION, a corporation, Appellant,

v.

J. J. ROBINETTE and John Robinette,
Appellees.

Nos. 97, 98.

Supreme Court of Alaska.

May 14, 1962.

Rehearing Denied July 11, 1962.

Albert Maffei, Anchorage, for appellant.

Charles E. Tulin, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This case involves two actions which were consolidated for trial below and on appeal here. In the first action J. J. Robinette as plaintiff sued to recover from the defendant, Chirikoff Island Cattle Corporation (hereinafter referred to as Chirikoff Corporation), on a claim in the sum of $4,095.18 for loans made by him to the defendant, and on another claim for $4,000 representing wages allegedly earned by the plaintiff as an employee of the defendant.[1] The second action pertained to the wage claim of Harold A. Kenny against Chirikoff Corporation for the sum of $10,891.66. The complaint alleged that Kenny assigned this claim to the plaintiff J. J. Robinette and the latter's brother John Robinette.

In its answers, the defendant denied that it owed any money to Kenny or to the plaintiffs, and contended at the trial, and now contends in its briefs on appeal, that, if there are any sums of money owing to the plaintiffs in this case, they are the obligations of one Harry E. Ryan, or of Palmer Cold Storage and Locker Service, a copartnership, or of the late S. N. Staveland.

The trial court found that Chirikoff Corporation employed both Kenny and J. J. Robinette, as alleged in the complaint, and owed them the amount claimed by each as wages earned; and it also found that J. J. Robinette had loaned various sums of money to the corporation, totalling $4,095.-18, which had not been repaid though demand therefor had been made. Conclusions of law and judgment based on these findings were entered against the defendant in both cases and this appeal followed.

The parties state that the basic question for review is whether the evidence sustains the findings of fact by the trial court. Actually, in a case tried to the court without a jury, as this was, our scope of review is limited to a determination of whether the findings are clearly erroneous. This is plainly set forth in the third sentence of our Civil Rule 52(a) which states:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The testimony introduced by the parties at the trial is in hopeless conflict on the basic issue of the defendant's liability. It would be a needless waste of this court's time to here detail all the pertinent evidence in the record, though a brief account of the general activities of the parties and others connected with the case may lend to a better understanding of the dispute involved.

The Chirikoff Corporation was engaged in the business of raising cattle on Chirikoff Island, a small island to the southwest of Kodiak Island, and then selling them through various outlets, principally to Palmer Cold Storage and Locker Service. A grazing lease to 60,000 acres of Chirikoff Island was held by either Ryan or the defendant corporation. In October of 1952, at Palmer, Alaska, Ryan employed Kenny at $200 per month to care for the cattle and fences on the island and to do some building and butchering there. Kenny was flown to the island and went to work there on November 1, 1952. He remained on the job for five years and four months, during which time he drew down some wages in cash and ordered and received some supplies which were charged against his wages account. Ryan assured him that the cattle on the island "would protect the wages," and suggested that Kenny take stock in Chirikoff Corporation for some of his

---

1. In the same action a co-plaintiff, Aero Enterprises, Inc., of which J. J. Robinette was the president, sought to recover $6,- 074.80 for air transportation services furnished to the defendant. That part of the case does not concern us here.

wages. The cattle were the property of the corporation.

The plaintiff, J. J. Robinette, was likewise hired to work on the island and to fly as co-pilot an airplane which was owned by Chirikoff Corporation and used to carry people and freight to and from the island and to do contract hauling for others. He did the maintenance work required for the plane. Robinette was employed by Ryan and one Sig Staveland, "as representatives of Cherikoff [sic] Island Cattle Corporation," for the period of July 1, 1954, through April 30, 1955, at $400 per month. He never received any of his wages. Some of the net profits from the operation of the airplane were used to reduce a mortgage indebtedness of Chirikoff Corporation to the person from whom it had purchased the Chirikoff Island Cattle business.

During the time of his employment as above mentioned, Robinette loaned money of his own to Chirikoff Corporation by way of paying for gasoline, parts and a new engine for the airplane and other out-of-pocket expenses connected with operating the airplane, also for supplies purchased for the island operation and the employees there.

Ryan, who figures prominently throughout the record, was a partner in Palmer Cold Storage and Locker Service from 1945. From 1950 until 1954 he held an option to purchase stock in Chirikoff Corporation from a Charles Waller who was negotiating to purchase the corporation. In April of 1954, Ryan became a stockholder in the corporation and served as a member of its board of directors and as its president from May 1954 until January 1958. At the time he hired Kenny in 1952 he had a "working agreement" with Chirikoff Corporation to handle "the meat and stuff that come [sic] up from there [Chirikoff Island] and was their agent in Palmer." He was then operating under the name of Palmer Cold Storage.

At one point in the trial, the judge himself questioned Ryan while he was in the witness chair and received these interesting admissions:

"THE COURT: I want to ask a few questions prior to your asking questions. * * * You were actually, in effect, when you were on Cherikoff [sic] Island wearing two caps, weren't you, one as a partnership of the Cold Storage and one of as the president of Cherikoff [sic] Island? Cattle company?

"A Well, you might say it was that way, yes.

"THE COURT: So that anyone doing business with you had no way of knowing who they were actually doing business with, would they?

"A Well, if there had been a stranger doing business with us, they wouldn't have known, no.

"THE COURT: Now your agreement with Cherikoff [sic], that is the agreement between Cold Storage and Cherikoff [sic] was that you would mutually agree on the purchase of so many cattle a year, is that right?

"A We agreed on the purchase price of the animals if we could—if the plane was in order in order to be able to get them off.

"THE COURT: Well when was it determined actually the amount of animals you could take? When was that decided?

"A It uh, well, never any specific number/decided [sic]

"THE COURT: Well until they were actually slaughtered and removed from the Island, the cattle were actually Cherikoff [sic] Island Cattle Company's property, wasn't it?

"A Yeh, they uh, they were.

"THE COURT: And uh, any work performed in connection with these cattle, wouldn't that be the ah Cherikoff [sic] Island Company building [sic]?

"A No sir.

"THE COURT: Why would Cold Storage be down there working on cattle belonging to Chirikoff Island?

"A Because uh—Cold Storage had the only employees down there.

"THE COURT: Well, why was that?

"A Because uh—Chirikoff Island had no uh—way of keeping any employees down there without—they wanted to run in opposition to the butchering con—the butchering, so uh —between the—we were all partners in the Cold Storage at the time this contract was let and was all partners in Chirikoff Island, and they [sic] had to be a certain amount of money put in to ah the First National Bank up here for McCord. In fact, the contract that Waller had with McCord, if you want me to tell you why exactly, I can tell you."

▮ Much of the plaintiffs' testimony relating to the defendant's liability for the three claims sued upon was sharply contradicted by evidence introduced by the defendant.[2] Under the circumstances we carefully examined the entire record before us and, guided by Rule 52(a) and another well recognized rule that an appellate court must take the view of the evidence most favorable to the prevailing party below,[3] we find here no such clear error as would require us to reverse the findings and judgment of the trial court.[4]

The defendant makes much of a so-called butchering contract admitted into evidence. This was a written agreement entered into between Chirikoff Corporation and Palmer Cold Storage and Locker Service (which we shall hereafter refer to as Palmer Cold Storage). It was signed on September 2, 1952, by "Charlie" Waller for the corporation, by Walter F. Cooper for the Palmer Cold Storage partnership, and by Walter F. Cooper and Harry E. Ryan as individuals. It became operative on the date of execution and was to terminate on October 1, 1960. Under its terms Chirikoff Corporation gave Palmer Cold Storage the right to buy a certain number of the corporation's cattle each year and to slaughter and process them on the island. Palmer Cold Storage was required "to pay for any labor performed or materials purchased, acquired or used" by it "in the operation of slaughtering, processing or shipping beef on and about Cherikoff [sic] Island. * * *" Palmer Cold Storage was given free use of the corporation's buildings on the island and was made responsible for their care and maintenance while in such use. The partnership also had the right to place additional improvements upon the premises and erect corrals and fences thereon for its cattle processing operations, but all at its own expense.

▮ Chirikoff Corporation admits that it owned the cattle, buildings and other properties on Chirikoff Island, used in the conduct of its cattle ranch there, but insists that Palmer Cold Storage was responsible for the cost of all operations on the island under the "butchering" contract. That may well have been the subjective intention of the defendant. But nowhere in the record can we find that this intention or the contract in question was known or disclosed to Kenny when he was hired to go to work on

2. Credibility choices are for the trier of the fact to make and his selection will generally be accepted by the reviewing court. This is so for the reason that the factfinder saw the witnesses testify, heard the inflection of their voices and observed their relative candor in answering questions. See United States v. Certain Interests in Property, etc., 296 F.2d 264, 268 (4th Cir. 1961) ; United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S. Ct. 177, 94 L.Ed. 150, 153 (1949).

3. See Los Angeles Shipbuilding & Drydock Corp. v. United States, 289 F.2d 222, 226 (9th Cir. 1961).

4. The defendant does not question the lack of such evidentiary findings as we might have considered necessary to provide a basis for the ultimate decision of the trial court and in this case we do not feel obliged to do so on our own motion.

the island or to J. J. Robinette when he was employed for the same purpose and when he began to lend the money which he is here seeking to recover. Even Horace J. Woodworth, who became a stockholder and secretary-treasurer of Chirikoff Corporation in 1954, testified that he assumed the men working on the island were employees of the defendant and it was not until about a year later, when Ryan explained the "butchering" contract at a meeting of the corporation's board of directors that he, Woodworth, became informed that Palmer Cold Storage was the employer on the island.

Since the ultimate findings made by the trial court indicate that it believed the facts and circumstances, which we have just related, to be true, there is no basis for giving any effect to the "butchering" contract in the dealings of Kenny and J. J. Robinette with Chirikoff Corporation, and we so hold.

The defendant also assigns as error the action of the trial court in allowing interest on the J. J. Robinette loan claim of $4,095.18. Its argument is that this claim was unliquidated until such time as the judgment was entered. We agree.

■ The interest statute of Alaska [5] provides that the rate of interest shall be six per cent per annum on all moneys after the same become due and upon money due upon the settlement of matured accounts from the day the balance is ascertained. In this case there was no due date fixed for the repayment of the several loans which Robinette claims he made to Chirikoff Corporation and it was not even determined until the trial of this case that Chirikoff Corporation and not someone else was liable to Robinette for the moneys he advanced.

Under these circumstances it was error to allow interest on the loan claim for any time previous to the date of the judgment.[6] Therefore the judgment for J. J. Robinette on his loan claim should be for $4,095.18, with interest thereon at the regular statutory rate from January 10, 1961, the date of the judgment, plus the attorney's fee allowed by the trial court in the sum of $554.76.

■ The last issue raised by the defendant is that the trial court committed error in finding that Kenny had assigned his wage claim to the plaintiffs. The argument on this point is that no written assignment was ever admitted in evidence and, therefore, the plaintiffs were not the real parties in interest [7] entitled to sue for Kenny's wages. This contention is not borne out by the record.

Kenny testified that he assigned his wage claim to the Robinettes. He spoke of the assignment as a "power of attorney" but this is clarified in the record and there it also appears that court and counsel treated the assignment as having been admitted in evidence, for we read:

[Cross examination by Mr. Maffei]

"Q Mr. Kenny, have you ever assigned your wage claim to anyone?

"A Yes I gave Mr. Robinette and John Robinette, his brother, power of attorney when I was out. * * *

"Q You gave him what?

"A A power of attorney to act in my stead. * * *

"Q Did you ever give them an assignment of your wages?

"A I don't believe I just understand the question.

5. Section 25–1–1 A.C.L.A.1949.

6. See Valentine v. Quackenbush, 4 Alaska Fed. 528, 532–533, 239 F. 832, 835–836 (9th Cir. 1917) ; Columbia Lumber Co., Inc. v. Agostino, 184 F.2d 731, 736, 13 Alaska 34, 46 (9th Cir. 1950) ; Dawson, Corbett & Shelp v. Lieurance & Canfield Const. Co., 68 Wyo. 465, 235 P.2d 457, 464–466 (1951).

7. Civ.Rule 17 provides as follows: "Every action shall be prosecuted in the name of the real party in interest; but an executor, administrator, guardian, trustee of an express trust * * * may sue in his own name without joining with him the party for whose benefit the action is brought; * * *."

"Q  You stated that you gave them a power of attorney, is that correct?

"A  Yes.

"Q  Would you mind showing me a copy of the power of attorney?

"A  You, uh, I believe Mr. Tulin—

"MR. TULIN: Your Honor, it's in evidence at the present time, the assigment of wages.

"THE COURT: Was it introduced as an exhibit?

"MR. TULIN: It was introduced as an exhibit.

"THE COURT: Where is the exhibit?

"MR. MAFFEI: What exhibit is it?

"MR. TULIN: Let me see here.

"THE CLERK: Plaintiff's exhibit—could this be it, Your Honor?

"THE COURT: Show it to Mr. Maffei.

"BY MR. MAFFEI:

"Q  Mr. Kenny, I'm going to hand you what is entitled Plaintiff's exhibit No. 1, and ask you if that is the assignment?

"A  Yes sir.

"Q  Is that it?

"A  That's right."

The judgment will be modified by eliminating therefrom the amount of interest allowed by the trial court on the Robinette loan claim prior to the date of rendition of the judgment and, as so modified, it will be affirmed.