Jennings GRAHAM, Appellant,

v.

James ROCKMAN, Appellee.

No. 1597.

Supreme Court of Alaska.

Dec. 26, 1972.

A. Fred Miller, Ketchikan, for appellant.

W. Clark Stump, of Stump & Stump, Ketchikan, for appellee.

OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

BOOCHEVER, Justice.

This appeal is from a judgment awarded the owner of an airplane for damages caused as the result of a crash while it was being used by a rental pilot.

On August 28, 1969, Jennings Graham rented a Cessna 172 B Skyhawk aircraft from James Rockman, owner of Rockman's Flying Service. Rockman, a licensed pilot with an instructor's rating, used the airplane for rental to licensed pilots and for teaching students to fly. Graham had taken lessons from Rockman and had obtained his license a year previously. Accompanied by his young son and a friend, Graham flew to Humpback Lake for fishing. It was an ideal day for flying, sunny with no measurable wind.

On the return flight, goats were spotted on a nearby mountain rim of a "horseshoe" shaped basin. Graham, flying at about 2,700 feet elevation, turned into the basin for the purpose of observing goats. He maintains on appeal that he was circumnavigating the rim of the basin, considered changing his path to fly straight ahead across the 2,500 foot left rim, but decided not to change his mind, and that "on his way out, the plane suddenly fell from the sky." The crash resulted in no serious injuries to the passengers, but the plane was totally destroyed.

Rockman brought suit seeking damages for the destruction of the plane and resultant loss of business. He contended that the crash was caused by Graham's negligence, and that as a bailee, Graham is liable for the resultant damages.

Graham alleged that the crash was caused by a sudden unpredictable downdraft or clear air turbulence which amounted to an "Act of God or an independent intervening cause". He maintained that either by express agreement or based on the custom in the business, Rockman had assumed the risk of the nonintentional destruction of the aircraft by renting it to Graham. Alternatively, Graham argued that as a permissive user of the aircraft, he is entitled to have the damage reduced by the proceeds of the hull insurance carried by Rockman.

The trial judge found for Rockman and awarded damages of $8,000 for loss of the aircraft and $250 for loss of profits, a total of $8,250.

## I

## THE NEGLIGENCE ISSUE

 It is not disputed that in the absence of other circumstances a bailee, such as Graham, is liable for injury to the bailed property attributable to his failure to exercise due care.[1]

Regardless of the type of bailment and the degree of care required of the bailee, the trend of modern authorities is in support of the rule that in order to throw the duty of proceeding with actual proof of negligence upon a bailor who has made out a prima facie case by showing that the chattel involved was damaged or destroyed while in the possession of the bailee, the bailee must not only prove that the damage or loss occurred by reason of theft, fire or other cause beyond his control, but produce further evidence in explanation of the actual damage or loss which would indicate exercise of care on his part in the protection of the property. It is reasoned, and we think rightly so, that the bailee being in possession of the chattel is in a better position to explain the origin of the fire or the circumstances of the theft or other cause which would determine whether the loss or damage was due to negligence. He should disclose, to the extent that he is able, the manner in which the damage or loss occurred, the facts and circumstances attending such damage or loss and the precautions taken to prevent it.[2]

The instant case was tried by the court without a jury. The primary issue was whether the crash was caused by pilot error or by an "Act of God" consisting of a sudden downdraft or clear air turbulence. The court made findings to the effect that Graham did not maintain sufficient airspeed to keep the plane in the air as he turned to leave the basin, that he failed to "use due care in flying the airplane into the basin looking for goats not having thought out his maneuvers to leave the basin and taking into account the hazards of clear air turbulence, downdrafts, the capability of the aircraft and other contingencies including his relative inexperience as a pilot," and that there was "no intervening cause of the crash, to wit: a downdraft or clear air turbulence."

We have stated that:

One who contends that the evidence is insufficient to support a finding of the trial judge has the task of convincing this court that a definite mistake has been made—that the finding in question is clearly erroneous.[3]

 Moreover, an appellate court must take the view of the evidence most favor-

1. Winchell v. Alaska Airlines, 13 Alaska 234, 96 F.Supp. 339 (D.C.Alaska 1951); Harris v. Deveau, 385 P.2d 283 (Alaska 1963).

2. Harris v. Deveau, *supra*, note 1, at 286.

3. Hamilton v. Lotto, 397 P.2d 980, 982 (Alaska 1965). *See also* Jameson v. Wurtz, 396 P.2d 68 (Alaska 1964); Ogden v. State, 395 P.2d 371 (Alaska 1964); Alaska R.Civ.P. 52(a).

able to the prevailing party below.[4] When reviewed under those standards, we find that the trial court's findings of negligence on the part of Graham were not clearly erroneous.

The plaintiff's expert witness, Eichner, who was not subjected to cross examination, testified that the airplane stalled and consequently hit the ground. Even the defendant's expert witness, Aegerter, during cross examination at one point, stated that he was not sure whether a stall or downdraft caused the loss of altitude.

Moreover, there was no measurable wind on the day of the accident and the defendant had experienced no wind or turbulence just prior to the crash. The expert witnesses had indicated that "clear air turbulence" usually occurs at relatively high altitudes such as 20,000 feet, while the crash took place at approximately 2,700 feet.

The trial court was entitled to draw on reasonable inferences from the testimony.[5] It could have concluded that Graham was negligent based upon the evidence that he was inexperienced as a pilot (he had but 65½ hours flying time), that there are dangers in looking for goats while flying into a basin 200 feet from its rim, that Graham was unfamiliar with the terrain, and that he made a sudden decision to turn into the basin without adequate consideration for the load he was carrying and the low horsepower of his plane.

Reviewing the record in the light of the evidence most favorable to Rockman, we find that it was ample to support the trial court's findings of negligence.

## II
## CONTRACTUAL ASSUMPTION OF THE RISK OF DAMAGE

Graham maintains that by virtue of the custom of the trade and by prior express conversations and dealings, Rockman assumed the risk of nonwillful destruction of the aircraft. The rule whereby a bailee bears the risk of injury to the bailed property resulting from his negligence can be modified by the contractual agreement between the parties[6] or by custom or usage.[7] The agreement by which Graham rented the airplane from Rockman was oral. The evidence as to the parties' understanding of that agreement is conflicting. Rockman stated that he told Graham to obtain his own insurance. Graham denied this and testified that his understanding of the agreement was that Rockman would bear the risk of loss of the aircraft. There thus was a conflict of evidence on the question of whether Rockman had agreed to assume the risk of loss of the aircraft.

Graham's answer expressly alleged that under terms and conditions of the rental of the aircraft to him, Rockman assumed all risks of damage to or loss of the airplane except for damage or loss intentionally caused. The court, however, made no specific findings on this issue. Included in the Conclusions of Law is the statement:

The defendant is liable for all injuries to plaintiff resulting proximately from the event of August 28, 1969, and which were foreseeable and has no defenses to such liability.

Despite this conclusion making reference to the absence of defenses, we are unable to determine whether the trial court specifically judged this issue, and if so, wheth-

4. Chirikoff Island Cattle Corp. v. Robinette, 372 P.2d 791 (Alaska 1962).

5. Grip Nut Co. v. Sharp, 150 F.2d 192, 196–197, (7th Cir.) cert. denied 326 U.S. 742, 66 S.Ct. 55, 90 L.Ed. 443 (1945); Correa v. Stephens, 429 P.2d 254, 257 (Alaska 1967).

6. Insurance Co. of North America v. Elgin, Joliet & Eastern Ry. Co., 229 F.2d 705, 712 (7th Cir. 1956).

7. Stock & Grove Inc. v. City of Juneau, 403 P.2d 171 (Alaska 1965). See also Ness v. National Indem. Co., 247 F.Supp. 944 (D.C.Alaska 1965); Spenard Plumbing & Heating Co. v. Wright, 370 P.2d 519 (Alaska 1962).

er he considered that the defense failed due to a legal theory or inadequate proof of requisite facts.

Alaska Rule of Civil Procedure 52(a) specifies: "In all actions tried upon the facts without a jury . . . the court shall find the facts specially . . . ."

In Merrill v. Merrill we stated:

> As one well recognized authority points out, findings of fact under Rule 52(a) have a threefold purpose: "as an aid in the trial judge's process of adjudication; for the purposes of res judicata and estoppel by judgment; and as an aid to the appellate court on review." To particularize, the requirement that the trial judge file findings of fact gives assurance that he has exercised care in ascertaining the facts, and has employed both skill and judgment in reducing his thoughts on contested matters to precise and pertinent findings while the evidence is still fresh in his mind. Further, under Rule 52(a), it is the duty of the trial court by sufficiently detailed and explicit findings "to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." [8] (Footnotes omitted)

■ Since we are unable to determine the basis of the court's decision on the issue of an express contract dealing with the risk of loss of the airplane, it will be necessary to remand the case for further findings on this issue.

■ Graham also alleged that there was a custom in Southeast Alaska, among other places, regarding the rental of aircraft whereby the person owning the airplane assumed all risk of damage except for damage intentionally caused. Extensive testimony was presented as to the existence of such a custom and there was also some testimony to the contrary.[9] Rockman argues that such a custom could not be established in a relatively small community such as Ketchikan where there are but two aircraft rental businesses; particularly when the owner of one of the businesses (Rockman) contended that he did not follow the practice of assuming the risk of non-intentional loss to his aircraft.

That argument, however, fails to make a necessary distinction between a custom or usage peculiar to a particular locality and one applicable to a trade or business. In Stock and Grove, Inc. v. City of Juneau,[10] this court stated

> That the clear and unambiguous terms of a contract may be interpreted by the general and accepted usage of the trade or business involved is the general rule of law. (Footnote omitted)

The proffered evidence in that case dealt with the practice in the construction industry, generally, not just in the City of Juneau, where the contract was performed.

■ Nevertheless, for Graham to prevail on this issue, it was necessary for him to establish that there was such a custom or usage in the airplane rental busi-

---

8. 368 P.2d 546, 548 (Alaska 1962). *See also* Stock & Grove, Inc. v. City of Juneau, 403 P.2d 171 (Alaska 1965); Hamilton v. Lotto, 391 P.2d 948 (Alaska 1964); Dickerson v. Geiermann, 368 P.2d 217 (Alaska 1962).

9. An insurance agent and an insurance broker testified to the effect that hull insurance was not generally available to renter pilots and that the owners of aircraft usually bore the risk of such damage. A person who rented the airplane testified with reference to various incidents when it had been damaged with-

out Rockman collecting from the users. Additional testimony was given by a witness engaged in the aircraft rental business in Ketchikan to the effect that he bore the risk of non-intentionally caused loss and that others in the aircraft rental business in Southeast Alaska did the same. Mr. Aegerter, who appeared as an expert witness for Graham and who had rented aircraft for his personal use both in Alaska and elsewhere, testified as to such a custom. Contrary testimony was presented by Mr. Rockman and a Mr. DeBoer.

10. 403 P.2d 171, 176 (Alaska 1965).

ness which was either known by Rockman or should have been known by him.

A person entering into a contract in the ordinary course of business is presumed to have done so in reference to any existing general usage or custom relating to such business. . . . And this is so whether he knew of the custom or not.[11] (Citations omitted)

Since the lower court made no specific findings as to whether a custom or usage was established by the evidence, we find it necessary to remand for further findings on this issue.

## III

### THE INSURANCE ISSUE

Rockman had secured an aviation hull policy on the aircraft in question and received payment from the insurance carrier.[12] To that extent, Rockman was acting on behalf of the carrier as its subrogee in seeking recovery from Graham. The parties stipulated that any rights of the insurance company, which was represented by Rockman's counsel, would be litigated in Rockman's suit.

■ Graham maintains that he should be regarded as an "additional insured" under the hull insurance carried by Rockman since use by rental pilots was covered in the policy. Accordingly, the insurance carrier would not be entitled to recover from Graham the amount which it paid to Rockman. It is well settled that an insurer cannot recover by means of subrogation against its own insured.[13]

Unlike many policies, Rockman's contains no definition of the term "insured". The cover page of the policy has Rockman's name typed as the "assured". The first clause of the policy states

WE, UNDERWRITERS AT LLOYD'S, London, agree with the *Insured, named in the Declarations made a part hereof, in* consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to the limits of liability, Exclusions, Conditions and other Terms of this Policy:— (Emphasis added.)

When one refers to the "declarations made a part hereof," there is a space for "Name of Insured" which was completed in the following manner:

DECLARATIONS

Item 1

Name of Insured JAMES KENNETH ROCKMAN
(hereinafter referred to as the insured)

■ Graham argues that Items 4 and 5 of the Declarations include rental pilots who thus should be considered as an "insured." Item 4 in part states:

Item 4

USE; The purposes for which the aircraft will be used are (Indicate those required.)
(A) [xx] "BUSINESS AND PLEASURE."
(B) [xx] "INDUSTRIAL AID."
(C) [xx] "LIMITED COMMERCIAL."
(D) [xx] "COMMERCIAL", including special uses (See (D) below)
STUDENT INSTRUCTION & RENTAL

The declaration does refer to a "rental" use, but the policy cannot literally be construed as naming "rental pilots". Even under the liberal construction applied to insurance policies, it is difficult to enlarge authorized "rental" use provisions of the declarations to encompass "rental pilots" as a "named" insured.

■ This, however, does not end our inquiry. In the absence of a policy definition of the term "insured," it may be argued

11. Steidtmann v. Joseph Lay Co., 234 Ill. 84, 88–89, 84 N.E. 640, 642 (1908). *Accord*, Miller v. Germain Seed Co., 193 Cal. 62, 222 P. 817 (1924). *See also* Sunset-Sternau Food Co. v. American Almond Products Co., 259 F.2d 93 (9th Cir. 1958); Wise v. Reeve Electronics, Inc., 183 Cal.App.2d 4, 6 Cal.Rptr. 587 (1960); Edmonson v. Mosley, 259 A.2d 110 (D.C.Ct.App.1969).

12. The coverage for in-flight destruction was $7,000, 10 percent deductible.

13. Miller v. Kujak, 4 Wis.2d 80, 90 N.W. 2d 137 (1958); Pendlebury v. Western Casualty and Surety Co., 89 Idaho 456, 406 P.2d 129 (1965).

that one using the aircraft as expressly permitted by the policy should be regarded as an additional insured. In considering the terms of the policy,

> We have held that insurance policies are to be looked upon as contracts of adhesion for the purpose of determining the rights of the parties thereto. In so construing a policy we do not require as a condition precedent that ambiguities be found in the policy language. All that is required is that the parties be of such disproportionate bargaining power that the insured could not have negotiated for variations in the terms of the standard policy. Thus the finding that a policy is a contract of adhesion depends not upon its language, but upon the relationship of the parties. The result of such a finding is that the policy is construed so as to provide that coverage which a layman would reasonably have expected given his lay interpretation of the policy's terms.[14] (Footnote omitted)

We are thus confronted with the question of what a layman, such as Rockman, would reasonably have expected given his lay interpretation of the policy terms.[15] In that connection, the custom or usage of the insurance industry with reference to such policies is germane. An insurance broker and the insurance agent, who wrote the policy, testified to the effect that the custom in the aviation hull insurance industry was that insurers did not subrogate in claims against renter pilots. This, in part, was based on the difficulty of renter pilots obtaining insurance policies of their own covering the various aircraft which they used, whereas the owner of the airplane could readily obtain such insurance.[16] Possibly due to such a custom in the insurance industry against subrogation in this situation, we have found but few cases on this subject and none on all fours with this case, despite the great volume of insurance litigation.

14. The Continental Ins. Co. v. Bussell, 498 P.2d 706 (Alaska 1972). *Cf.* Nat. Indemnity Co. v. Flesher, 469 P.2d 360 (Alaska 1970).

15. We cannot, of course, ascertain Rockman's subjective views at the time of securing the policy. Any post-litigation statements by him would be of little value, but in any event, he did not testify as to his expectations at the time he obtained the policy.

16. The insurance broker testified in part
> Within my knowledge of this sort of thing, I would say that the custom is that a renter goes in to rent an airplane, that the owner of that aircraft carries the insurance to protect his aircraft and that the renter has—uh—the no—there's no responsibility laid back on the renter of the aircraft for that loss. The man is charging for the use of his airplane. In the process of charging for the use of his airplane also is (sic) charging for the cost of insurance, and to my knowledge, I've never seen a form or contract that renters signed that put (sic) him responsible for the physical loss of the aircraft.

The agent who sold the policy stated
> As a custom, I would say the custom is not to—uh—pursue subrogation rights, and here again, prior to this particular loss, that was my impression, and then when I was involved in this situation I made inquiries of the underwriters who wrote the policy and of other surplus lines firms who write insurance of this nature, and it was their advice to me that this was not a normal thing. They were very surprised that subrogation action was being considered at that time.

With reference to the availability of such insurance to renter pilots, the agent continued
> Well, this is another question I asked after this particular incident occurred, and—uh—I couldn't find any of the surplus underwriters who even wrote this type of insurance. It could be written for liability although liability was normally considered superfluous because the liability contract includes the renter as well as the person renting the aircraft, but—uh—there apparently was no market available, and the people I made inquiries of said that it was considered to be impractical because seldom did a person rent the same aircraft. If they had a corporate officer who used a specific aircraft, there was no problem. They could provide a policy, and they provided on that aircraft for that hull because every hull, you know, has a different value and so on. But in the

Several cases do touch on a related problem, the effect of the condition of the policy which specifies

## 7. NO BENEFIT TO BAILEE.

The insurance afforded by this Policy shall not enure directly or indirectly to the benefit of any carrier or bailee.[17]

As in the case of the term "insured," there is no definition in the policy of the terms "bailee" or "benefit" or "carrier". There is no dispute, however, over the fact that Graham was a bailee. A question is therefore presented as to whether the clause defeats Graham's defense to the subrogated portion of Rockman's claim.

The applicability of the "no benefit to bailee" clause will be determined by resolution of the question of whether Graham may be regarded as an additional insured. If he is to be so regarded, then the carrier has no rights of subrogation against him. As the court stated in *Western Mutual*

When Standard satisfies its obligation to its named insured under the collision feature of this policy, the benefit enures to the named insured. The permissive user is not benefited so far as Standard is concerned, since it never had a right of action against its own insured. [The permissive user][18]

If, on the other hand, Graham is not to be regarded as an additional insured, there would be no reason to prevent the insurance company from seeking recovery against him under its subrogation rights.

The trial court has made no specific findings with reference to the insurance defense. The terms of the policy are not so clear that we can determine without the benefit of the testimony "that coverage which a layman would reasonably have expected given his lay interpretation of the policy's terms".[19] The trial court which heard that testimony is best able to evaluate it. Since resolution of the question of whether Graham is to be regarded as an "insured" under the policy will depend in part on such an evaluation of the testimony, touching on the expectation of the parties to the policy, we also remand this issue to the trial court for further findings.

This case accordingly is remanded to the trial court for the purpose of making additional findings, resolving the various issues set forth in this opinion, and rendering a new judgment if and to the extent necessary.

---

case of the ordinary renter who rents one day in Ketchikan maybe, from Jim Rockman, and another day from Jack Cousins, and maybe the next month is in Tacoma, a field there, renting an aircraft there seems to be no practical way to provide protection.

17. In Western States Mut. Ins. Co. v. Standard Mut. Ins. Co., 26 Ill.App.2d 378, 167 N.E.2d 833 (1960), the court in effect found a permissive user of an automobile to be an additional insured, although not defined as such for purposes of collision insurance. The insurance carrier was denied the right to subrogate against the permissive user based in part on the construction of a condition of the policy requiring the "insured" to "do whatever is necessary to secure such rights (subrogation) for the company." Since the court concluded that the permissive user was an "insured" under that provision, it concluded that he could not be required to cooperate with the company and still be subject to subrogation

by it. Having reached this conclusion, the court had little difficulty in holding the "no benefit to bailee" clause inapplicable.

Aviation Employees Ins. Co. v. Barclay, 237 Md. 318, 206 A.2d 119, 120 (1965), reached an opposite result. But in that case, the "no benefit to bailee" clause contained additional language not present in the Rockman policy expressly prohibiting the insured from releasing any right that the insured might have to recover from any "carrier, bailee or other party liable therefore."

A third case, Ins. Co. of North America v. Crippen, 223 S.W.2d 297 (Tex.Civ. App.1949) holds that a lessee is entitled to the protection of lessor's hull insurance on a damaged aircraft.

18. Western States Mut. Ins. Co. v. Standard Mut. Ins. Co., 26 Ill.App.2d 378, 167 N.E.2d 833, 837 (1960).

19. The Continental Ins. Co. v. Bussell, *supra* note 13.