SAMUEL H., Appellant,

v.

STATE of Alaska, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–12610.

Supreme Court of Alaska.

Feb. 8, 2008.

G. Blair McCune, Anchorage, for Appellant.

Michael Hotchkin, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A father, Samuel, appeals the superior court's termination of his parental rights to his daughter Georgia.[1] The Office of Children's Services (OCS) started Child in Need of Aid (CINA) proceedings shortly after Georgia was born cocaine-positive. OCS placed Georgia with Loretta, her maternal grandmother. Georgia's mother, Sylvia, subsequently relinquished her parental rights. Except for a period of thirty-five days, Samuel has been incarcerated since Georgia was

born, but he was in contact with Sylvia and both maternal grandparents concerning the birth and arrangements for the child's care. OCS successfully petitioned the superior court to terminate Samuel's rights so that Loretta could permanently adopt Georgia. Samuel appeals the superior court's termination order, arguing that the court erred in: (1) finding that he failed to make adequate provisions for Georgia during his incarceration, and (2) holding that termination of Samuel's parental rights was in Georgia's best interest. Because the superior court did not make findings that are sufficiently specific to support the conclusion that Samuel failed to make arrangements for his daughter's care upon her birth, we vacate the termination of his parental rights and we remand to the superior court for further findings.

## II. FACTS AND PROCEEDINGS

### A. Facts

Sylvia gave birth to Georgia on September 21, 2004. When Georgia was born, Samuel was serving time in prison for domestic violence assault. Because Georgia was born cocaine-positive, OCS became involved. Samuel testified that he knew that OCS was likely to take custody of Georgia upon her birth. Accordingly, he and Loretta, Georgia's maternal grandmother, arranged that Loretta would care for Georgia because Sylvia was unable to care for Georgia and Samuel was in prison. Although Georgia was not immediately removed from Sylvia's care, Loretta cared for the baby as Sylvia was living with her at the time.

OCS developed a case plan for Sylvia, who admitted to using drugs both during and after her pregnancy. Sylvia failed to comply with any aspect of the case plan, including the random urinalysis (UA) tests.

Upon discovering that Sylvia had left Loretta's home and taken Georgia with her for several days, and that she continued to use drugs, OCS petitioned for removal and placed Georgia in Loretta's care. OCS did not consult Samuel about this placement. OCS also considered Samuel's mother for Georgia's placement, but ultimately decided

---

1. In order to protect the privacy of the parties, we use pseudonyms.

to place the baby with Loretta so that Sylvia, who also lived with Loretta, would have an opportunity to bond with Georgia. OCS testified that it also decided to place the child with Loretta, instead of Samuel's mother, because paternity had not yet been officially established. Samuel, who testified that he had been on the telephone during Georgia's birth, never contested paternity and was officially identified as the father in June 2005.

While Samuel was in prison, Sylvia brought Georgia to visit him several times. Shortly after Georgia's birth, Samuel was released from prison. He remained out of jail for thirty-five days. During this time, Georgia continued to live with Loretta. Samuel visited Georgia and bought supplies for her care. Samuel estimates that he spent about $350 to $400 on Georgia during his time out of prison.

In October 2005 Samuel was indicted on federal drug charges. Before Samuel was transferred to federal prison outside of Alaska, Loretta brought Georgia to visit him on three occasions. Samuel pled guilty to one count of cocaine distribution. The federal court sentenced Samuel to 108 months (nine years). Under that sentence, Samuel would not be released until 2014. According to Samuel, his new projected release date is December 2012. Samuel testified that he most likely will be released eighteen months earlier than the projected release date due to participation in a drug treatment program prescribed by the judge in his criminal case. By Samuel's earliest possible release date, summer 2011, Georgia will be six years old.

While Samuel was in prison, OCS formulated a case plan for Georgia's care. The plan directed Samuel to "comply with any legal requirements, [Department of Corrections] requirements, or federal requirements regarding his criminal case." Samuel thus far has been compliant with this case plan. OCS's social worker testified that "if and when he's released, [OCS will] probably develop a new case plan which will state he will do the assessment, substance abuse, parenting, domestic violence classes, and so forth." While incarcerated, Samuel has complied with the department's order that he pay fifty dollars per month in child support.

Before the termination trial, Sylvia continued to suffer with substance abuse issues. She spent time in a drug detox center and a drug addiction treatment center. She left the drug treatment center "against treatment advice" after three days. Sylvia subsequently relinquished her parental rights in April 2006. The court legally terminated Sylvia's rights to Georgia in April 2007.

Although Samuel refused to relinquish his parental rights as Sylvia had, Samuel supported OCS's placement of Georgia with her grandmother Loretta and approved of Loretta's proposed adoption of Georgia. OCS also endorses adoption by Loretta and reported that the placement "is appropriate and meets the child's best interests."

## B. Proceedings

OCS first became involved in Georgia's case in October 2004 when it filed an Emergency Petition for Adjudication of Child in Need of Aid and for Temporary Placement. In August 2005 the court held a hearing in the CINA case. Sylvia did not attend the hearing and her whereabouts were not known at the time. Samuel participated telephonically from prison. Samuel argued that the CINA proceedings and OCS's involvement were not necessary because Georgia was already placed with "a relative who's appropriate and willing to care."

The court found that Georgia was a child in need of aid because (1) she was abandoned by Sylvia, (2) Samuel was incarcerated and failed to provide "adequate arrangements" for Georgia while he was away, (3) Sylvia and Samuel neglected to provide adequate support for Georgia, and (4) Sylvia "exposed [Georgia] to a substantial risk of harm by the drug use." The court further held that OCS made reasonable efforts to prevent the removal of Georgia from her home. The court granted temporary custody of Georgia to OCS.

Following the CINA hearing, the state initiated proceedings to terminate Samuel's parental rights. Trial in Samuel's case took place in May 2006. (No termination for Sylvia was necessary as she voluntarily relinquished her parental rights.) The court

heard testimony from two witnesses, Samuel and OCS's social worker. In her closing remarks, counsel for Samuel argued that OCS had not made reasonable efforts to keep the child with her family and therefore the state failed to meet its burden. The court, troubled that OCS had not earlier sought a ruling relieving the department from making reasonable efforts, asked both parties to brief whether OCS was required to make such efforts under the statute. After reviewing the briefing of each party, the court ruled that OCS had not made reasonable efforts, but that reasonable efforts were not required pursuant to the termination statute, AS 47.10.086(c)(10).

Trial resumed following the court's ruling. The parties each presented further argument, but did not present new evidence. The court orally found that it was in Georgia's best interest for Samuel's parental rights to be terminated "based in part upon the fact that she is entitled to permanency and also based upon the fact that adoption cannot go forward until [Samuel]'s rights are terminated." The court followed up with a written order in January 2007. Samuel appeals the termination of his parental rights.

## III. STANDARD OF REVIEW

 In a CINA case, we will affirm factual findings of the superior court so long as they are not clearly erroneous.[2] We will find that a holding is clearly erroneous if our "review of the entire record leaves us with a definite and firm conviction that the superior court made a mistake. Whether the superior court's factual findings comport with the requirements of the CINA statutes is a question of law that we review *de novo*."[3]

## IV. DISCUSSION

The court terminated Samuel's parental rights pursuant to AS 47.10.080(c) and AS 47.10.088. Alaska Statute 47.10.080(c) provides that upon a finding that a child is in need of aid, the court may terminate the

parents' rights and order the child committed to OCS. Alaska Statute 47.10.088 prescribes the method for terminating an incarcerated parent's rights.

**A. In the Absence of Specific Findings that Samuel Was Not Credible or that His Testimony that He Arranged for Sylvia's Care Was Not Reliable, It Was Error To Conclude that Samuel Failed To Make Adequate Provisions for Georgia During His Incarceration.**

 Alaska Statute 47.10.088(a) allows for the termination of a parent's rights if (1) the child has been subject to one of the conditions laid out in AS 47.10.011, (2) the parent has not remedied the conditions that placed the child in harm, and (3) the state has made reasonable efforts pursuant to AS 47.10.086. Samuel does not appeal and, therefore, waives the reasonable efforts issue. He only appeals whether the court erred in finding that Georgia was subjected to a condition that caused her to be a child in need of aid.[4]

Alaska Statute 47.10.011(2) provides a basis for termination if "a parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child." Samuel does not contest the first two conditions of AS 47.10.011(2); he concedes that he is currently incarcerated and that Sylvia is an absent parent.

Samuel argues that the superior court erred in finding that he "failed to make adequate provisions for care of the child during the period of incarceration that will be during the child's minority." He points to three facts that he purports demonstrate how he made adequate provisions for Georgia. Samuel contends that his regular payment of child support, his provision of goods for

---

**2.** *Erica A. v. State,* 66 P.3d 1, 6 (Alaska 2003).

**3.** *Burke P. v. State,* 162 P.3d 1239, 1242–43 (Alaska 2007) (internal citations omitted).

**4.** As the second prong of the test turns on establishing one of the conditions outlined in the first prong, we do not need to reach this prong because Samuel only argues that the condition never existed and therefore there is no condition to be remedied.

Georgia during the thirty-five days of her life that he was not incarcerated, and his approval of her placement with her maternal grandmother collectively constitute adequate provisions. The state argues that these actions do not amount to adequate arrangements.

Only two published Alaska cases parse the meaning of "adequate arrangements": *Stanley B. v. State*[5] and *T.F. v. State, Department of Health & Social Services.*[6] In *Stanley B.*, OCS moved to terminate parental rights under AS 47.10.080(c), a statute that allows for termination of an incarcerated parent under the same grounds as AS 47.10.088 but does not require the state to make reasonable efforts.[7] Like Samuel, Stanley, the incarcerated father in *Stanley B.*, did not contest that his incarceration amounted to a significant time away from his children and that the other parent was absent from his children's life.[8] Stanley appealed only the court's finding that he had failed to provide adequate arrangements. Stanley argued that because his children were already in the care of the department at the time of his incarceration, he was not obligated to make adequate arrangements for their care.[9] Stanley also argued that even if he were required to make adequate arrangements, he had done so by providing the department with a list that named relatives who could care for his children.[10] We rejected both arguments.

On the first, we held that the fact that the children were already in the department's care upon Stanley's arrest did not relieve Stanley of the requirement to provide adequate arrangements for his children. We noted that Stanley's interpretation would give an advantage to parents who are arrested when their children are already in state custody over parents who are arrested when they had custody.[11] We then considered Stanley's argument that he had adequately arranged for his children in his absence un-

der AS 47.10.088(c) by providing to the department a list of relatives willing to care for his children.[12] The department, however, had found that none of the relatives submitted by Stanley to care for his children was appropriate.[13] We concluded that because Stanley did not provide feasible options for the placement of his children he did not satisfy the third prong of AS 47.10.088(o).[14] *Stanley B.* requires incarcerated parents to take affirmative steps to arrange appropriate and feasible care options independent of department action. The issue in this case is whether Samuel took such affirmative steps.

In reviewing this issue, we have noted testimony by Samuel that, if true, would support a finding that he took affirmative steps to make adequate arrangements for Georgia upon her birth. During his termination hearing, Samuel testified that he played a role in determining Georgia's placement from her birth. He testified that he was on the phone for her birth, while his mother and Loretta were at the hospital to support Sylvia and Georgia. His mother, knowing that OCS was likely to take custody of Georgia because of Sylvia's drug troubles, called Loretta to take Georgia. Samuel's testimony, if credible, shows that he participated in arranging for Georgia to be placed with Loretta before OCS placed the child with her grandmother:

Q: When [Georgia] was first born and was first taken into OCS custody ... did you have a placement option for her?

A: ... My mom knew what was going to happen ... [W]e talked about a—a placement either with my mom or with [Loretta]. You know, we were all discussing it as a family ... [W]e're all uniform. We talked with each other....;

Q: Okay. So it's ... your position in the beginning and it's still your position that

5. 93 P.3d 403 (Alaska 2004).

6. 26 P.3d 1089 (Alaska 2001).

7. 93 P.3d at 406; AS 47.10.080(c).

8. 93 P.3d at 406.

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

there were arrangements made so that . . . she could be taken care of.

A: . . . With the courts, it sounds like they wanted me to call OCS to make an arrangement, but, see, me, I've never been in this situation, so of course, ultimately, I'm just going to call my mom or I'm going to call [Loretta] and, like, hey, you know this is what we need to with [Georgia] . . . I didn't call down there and find out who the social worker is right away and go that way. Maybe I should have, but, you know, I made arrangements in—my way.

Samuel may not have made formal arrangements with OCS, but his testimony indicates that he did make arrangements in the only way he knew how—by arranging with his family members to assure that Georgia had a safe home in the care of someone other than the baby's drug-addicted mother. To require any more formality would impose a substantial and unnecessary burden on incarcerated parents, who may not have access to attorneys or the court system to instruct them on how to protect their legal relationship with children in their absence. In the CINA hearing, the state argued that Samuel should have (1) arranged to have Loretta appointed the legal guardian, (2) signed a power of attorney to Loretta for Georgia's care, or (3) otherwise given Loretta legal authority to care for Georgia. The state further argues that Samuel could have "suggested contingent placements in the event that the placement with Loretta did not work out." We decline to hold that "adequate arrangements" under AS 47.10.080(c) includes the requirement that an incarcerated parent must follow a formal procedure to initiate legal proceedings to formalize arrangements made for the child and make alternative plans merely because the parent's plans overlap with OCS's arrangements. An arrangement is adequate if, when followed, it will provide for the care of the child. If Samuel's testimony concern-

ing this point, therefore, is true, he did make adequate arrangements for Georgia.

Samuel's testimony on his participation in the placement of Georgia with Loretta was not rebutted in his termination hearing. The superior court, in its order, did not make factual findings on Samuel's credibility or the evidence he submitted. The court's only finding on the issue of adequate provisions was conclusory: Samuel "has failed to make adequate provisions for care of the child during the period of incarceration that will be during the child's minority." We must, therefore, review a superior court's order that does not contain specific findings relevant to the issue on appeal.

We have confronted this issue before in several different legal contexts and concluded that it is not the role of an appellate court to make findings of credibility.[15] When a trial court discredits a witness's testimony but fails to make specific findings on credibility we will remand to the trial court to make such findings or to reverse its decision. In *Brooks v. Brooks,*[16] the superior court entered an order dividing assets between a husband and wife that did not credit the husband with assets that his accountant testified were owned by the husband prior to the marriage.[17] In reviewing the order, we found "[t]he trial court made no credibility findings and there is absolutely no indication as to what weight it accorded this evidence."[18] Accordingly, we vacated that portion of the order and remanded to the superior court with instructions to either make findings that support its conclusion or reverse its prior order to comport with the uncontested testimony.[19]

In the torts context, we addressed a similar issue in *Graham v. Rockman.*[20] In *Graham*, we remanded in part where the trial court stated broadly that the alleged tortfea-

---

**15.** *See, e.g., State v. Adams,* 145 P.3d 590, 591 (Alaska 2006) (finding court of appeals erred in substituting its own judgment as to credibility of witness); *Anthony v. State,* 521 P.2d 486, 492 (Alaska 1974) ("The assessment of witness credibility is exclusively within the province of the [fact finder].").

**16.** 733 P.2d 1044 (Alaska 1987).

**17.** *Id.* at 1052.

**18.** *Id.*

**19.** *Id.*

**20.** 504 P.2d 1351 (Alaska 1972).

sor had "no defenses to such liability."[21] The superior court failed to make any further findings regarding the appellant's defenses.[22] We remanded, holding that we were "unable to determine whether the trial court specifically judged this issue, and if so, whether he considered that the defense failed due to a legal theory or inadequate proof of requisite facts."[23] We noted that trial courts must follow Civil Rule 52(a), which requires that judges make factual findings to support legal conclusions, and emphasized the importance of specific factual findings for appellate review.[24]

These cases are not aberrant.[25] We can review legal conclusions only when the trial court has made sufficiently detailed factual findings to support those legal conclusions. Without explicit findings on Samuel's credibility or factual findings on Samuel's testimony that he arranged, along with his mother and Loretta, to place Georgia in Loretta's care, we are unable to review the superior court's conclusion that Samuel failed to make adequate provisions. We remand to the superior court to make findings as to this specific portion of the evidence.

**B. It Is Not Necessary To Reach the Issue of Georgia's Best Interests.**

As we are remanding the issue of adequate arrangements to the superior court, it is unnecessary to reach the best interests of the child issue.

## V. CONCLUSION

Because the superior court did not make factual findings on the credibility of the father's testimony and because his testimony, if believed, demonstrates that he did make adequate arrangements for his daughter, we VACATE the superior court's termination of the father's parental rights. We REMAND to the superior court for further proceedings consistent with this opinion.

**21.** *Id.* at 1354–55.

**22.** *Id.*

**23.** *Id.*

**24.** *Id.*

**25.** *See, e.g., Bakke v. State,* 744 P.2d 655, 656 (Alaska 1987) ("From the record and findings before us, we are unable to determine the basis of the trial court's decision.... Accordingly, we remand this action with instructions that the trial court either support its conclusion ... or dismiss the action in favor of the State."); *Murray v. Murray,* 856 P.2d 463, 466 (Alaska 1993) (remanding for "findings sufficiently detailed and explicit to give us a clear understanding of the trial court's decision"). .