**JOSH L., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–14160.

Supreme Court of Alaska.

May 18, 2012.

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant.

Julie Fields, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

PER CURIAM.

## I. INTRODUCTION

A father appeals the termination of his parental rights to his daughter, an Indian child within the meaning of the Indian Child Welfare Act (ICWA).[1] The father challenges the superior court's findings that the Office of Children's Services (OCS) made active efforts to prevent the breakup of his Indian family, arguing that OCS failed to investigate placement with his extended family members and did not provide him with adequate visitation and remedial services. Because we conclude that OCS made active efforts, we affirm.

## II. FACTS

### A. Eva's Early Childhood And Special Needs

Robin and Josh[2] are both enrolled members of different Alaska Native villages. Eva, their daughter, was born in 1996. Robin was often absent and Josh cared for Eva for the first six years of her life with help from his mother, Susan, and one of his sisters, Sandra. In 2002, Eva lived with her grandmother while Josh served a two-month jail sentence.[3] Before Josh's release, Eva's grandmother sent her to live with Robin.

In August 2006, Eva assaulted her mother and tried to injure herself. Eva was placed on overnight observation at the Behavioral Health unit of the Yukon Kuskokwin Correctional Center. Through the correctional center, Eva was sent to the North Star Resi-

---

1. 25 U.S.C. § 1903(4) (2006).

2. We use pseudonyms to protect the family's privacy.

3. Josh has a history of violent criminal and sexual offenses.

dential Treatment Center in Anchorage and admitted for treatment. In April 2007, North Star reported to OCS that Eva needed to be placed in an acute care facility but North Star could not locate Robin. OCS assisted North Star in locating Robin and obtaining her permission to admit Eva to the North Star Acute Care Facility. OCS also opened an in-home case with Robin to assist her in keeping in contact with Eva and engaging in Eva's treatment. A social worker visited her on a monthly basis and arranged for her to participate in Eva's weekly family therapy sessions by telephone, but Robin failed to participate consistently in the therapy sessions and often did not return OCS's calls. In October 2007, Eva was transferred to a therapeutic treatment home in Anchorage for emotionally-disturbed and behaviorally-challenged children. Anchorage Community Services (ACS) became involved and developed a treatment plan for Eva.

Eva was diagnosed with cognitive disorders stemming from exposure to alcohol, post-traumatic stress disorder from exposure to physical violence and abuse, attention deficit hyperactivity disorder (ADHD), and major depressive disorder. She also experienced delusions and hallucinations. She had difficulty managing her moods, would become easily agitated and frustrated, was prone to "explosive outbursts" and tantrums, and had trouble sleeping. She functioned best in highly structured settings and required lists, prompts, and coaching to complete daily activities, such as brushing her teeth, making her bed, and dressing herself.

### B. OCS Assumes Custody Of Eva And Works Towards Reunification.

In September 2008, ACS contacted OCS and reported that Eva was ready to be discharged to a therapeutic foster home but Robin could not be located. Robin had not communicated with Eva's ACS case manager in over two months and had not communicated with Eva in over one month. Josh's whereabouts were also unknown at the time. ACS filed a protective services report with OCS and OCS filed an emergency petition for temporary custody and adjudication of Eva as a child in need of aid.

Robin did not attend Eva's treatment plan review on September 30, 2008, or the initial case conference in October. OCS located Josh at a correctional facility where he was incarcerated while awaiting trial on criminal charges for sexual assault and incest. Josh participated in the initial case conference with his attorney, a representative from his tribe, and Eva's primary social worker, Melissa Blair. Josh's tribe had previously provided OCS with his parents' contact information and requested that OCS contact them as a potential placement for Eva. At the conference, Josh also suggested one of his sisters, Rachel, as a possible placement. Blair noted she would need to consult Eva's therapist before scheduling visits between Eva and Josh. Josh asked to send letters to Eva and was told to send the letters to OCS and they would be sent on to Eva. Blair recommended that Josh obtain mental health, anger management, and substance abuse assessments. He was to participate in available programs while in jail and complete the remaining tasks after being released.

OCS developed a case plan for Josh and Robin and sent copies of the plan to both Josh's and Robin's tribes. The case plan stated a relative search was in progress and OCS was sending letters to the tribes seeking possible relative placements. The permanency goal for Eva was reunification with Robin. Robin's objectives included engaging in Eva's treatment, visiting by phone on a scheduled basis, and attending parenting classes and counseling to understand Eva's special needs. Josh's objectives included completing assessments for mental health, anger management, and substance abuse; attending parenting classes and counseling to understand Eva's special needs; and engaging in Eva's therapy when she was ready.

In December 2008, OCS filed a predisposition report with the superior court. According to the report, a social worker was working with Josh to coordinate telephonic visitation with Eva, although this was difficult due to limitations on his ability to use the phone at the correctional facility. Social worker Blair later testified she proposed arranging calls through Josh's attorney, and faxed Josh his case plan and court filings. The predisposition report also stated that Eva was placed in a therapeutic foster home

and that Robin and Josh both supported her placement there, although Josh wanted some of his family members to be considered for placement as well. The report stated that a social worker would look into family members requested for placement when Eva was ready to be discharged from the therapeutic foster home.

### C. Adjudication Of Eva As A Child In Need Of Aid

In January 2009, Josh signed several stipulations agreeing that Eva was a child in need of aid under AS 47.10.011(1) (abandonment) and (2) (incarceration), that it would be in Eva's best interests for OCS to assume temporary custody of her, that OCS had made "reasonable and active efforts" to prevent the breakup of his Indian family, and that there was good cause to deviate from ICWA's placement preferences by placing Eva in a therapeutic foster home in Anchorage because of her special needs. Based on these stipulations, the superior court found that Eva was a child in need of aid and awarded temporary custody to OCS. The court also agreed with the stipulation that Eva's special needs justified deviation from ICWA's placement preferences and allowed her to remain in her therapeutic foster home. The court ordered Josh to work with OCS to update his case plan and complete his assigned tasks, to have no contact with Eva except as arranged by OCS, and to provide OCS with the names and locations of any relatives willing to have Eva placed in their homes.

### D. OCS's Continued Reunification Efforts And Placement Investigations.

OCS updated the case plan in February 2009. Blair noted that she had not heard from Josh but would continue to attempt to contact him. Robin had been moving from home to home because she was unable to keep her trailer warm, and this was a concern because Eva needed a stable and consistent environment. The updated plan required Robin to "demonstrate a stable, consistent home for herself and her family" and provide "heat, food, and shelter." OCS updated the case plan again

in March 2009, changing Eva's permanency goal to adoption with family reunification as a concurrent goal, because neither parent had made any progress with their case plans.

In June and July 2009, OCS continued to contact and meet with Robin, and warned her that her parental rights would be terminated if she continued to fail to make progress on her case plan. In July 2009, Josh was convicted of the sexual assault and incest charges that had been pending since February 2008 and was sentenced to 99 years of imprisonment.[4]

On October 5, 2009, at a permanency hearing, the superior court found that Eva was still a child in need of aid, that neither parent had made substantial progress on remedying their conduct, and that OCS had made active efforts up to that point.

Also in October 2009, Josh's attorney sent Blair an email proposing placement with Josh's sisters, but the email did not specify which of his six sisters Josh wanted OCS to consider for placement. Blair later testified that she believed Josh's attorney was going to talk to Josh about the services Eva needed and identify which sisters could meet those needs. According to Blair, OCS had looked into placement with Josh's parents at that point, but she had concerns about their ability to meet Eva's special needs and concerns about whether adequate support services would be available to Eva in their village.

A few days after receiving the email, Blair was transferred to a different OCS office. OCS did not assign a new primary social worker to Robin and Josh until April 2010. Holly Lehnhausen, one of Eva's secondary social workers, helped out with some of the duties of a primary social worker during this time. Lehnhausen wrote Robin multiple letters but received no response. She also wrote to Josh offering to facilitate communication with Eva. Josh began sending Eva letters and pictures that she and her therapist would review during their therapy sessions. Lehnhausen also sent letters to Josh from Eva, along with pictures and school-

---

4. Josh has appealed both his conviction and sentence. His appeal is currently pending before the court of appeals.

work. Lehnhausen asked Josh about possible placement with his family members and he again said his sisters were possibilities. Lehnhausen contacted Blair and was told the sisters "were not viable placement options [because] they [were] known to have sex offenders in the home."

In April 2010, OCS petitioned to terminate Robin's and Josh's parental rights to Eva. OCS also assigned Michelle Rogers to Eva's case as the new primary social worker.

In July 2010, OCS worked with Eva's foster parents to send a newsletter Eva had written about her life in Anchorage to her relatives, including Josh's mother, Susan, and his sister, Sandra. OCS also mailed Susan and Sandra phone cards with instructions for calling in to Eva's weekly therapy sessions, but neither responded.

In August 2010, OCS assigned another primary social worker, Iurie Leahu, to Eva's case. Leahu asked Josh's tribe about its position on the possible placement of Eva with Josh's family, but the tribe did not respond. In September 2010, Leahu met with Susan and Sandra, who live together, about conducting an adoption study. He informed them of Eva's diagnoses, her special needs, and the information they would need to provide as part of the adoption study. Susan said she would like to "think about the placement" and requested a visit with Eva in Anchorage. At the termination trial in October 2010, Leahu testified he intended to visit Susan's home as the next step in OCS's placement investigation, but OCS had some concerns about her ability to provide the supervision Eva required. Leahu also planned on investigating an Anchorage couple that had expressed interest in adopting Eva. The Anchorage couple operated a therapeutic foster home similar to the one where Eva was living and had occasionally provided care for Eva over the years. According to Eva's foster mother, Eva wanted to be adopted by this couple.

### E. Termination Of Parental Rights

Following a four-day trial in October 2010, the superior court terminated both Robin's and Josh's parental rights to Eva. The court noted that Eva's guardian ad litem supported termination, that Josh's tribe had taken no position regarding termination of his parental rights, and that the tribe had "admitted that Eva needed a lot of services that might not be available in the village." The court found that: (1) Eva was a child in need of aid under AS 47.10.011(1) (abandonment) and (2) (incarceration); (2) Robin and Josh had not remedied the conduct or conditions that placed Eva at harm because Robin was still unwilling and unable to care for Eva, and Josh was serving a 99–year prison term and had failed to make adequate provisions for Eva's care; (3) OCS had satisfied ICWA's active efforts requirement; (4) Eva would suffer serious emotional or physical harm if returned to either parent's custody; and (5) terminating both Robin's and Josh's parental rights was in Eva's best interests.

Josh appeals the superior court's finding that OCS made active efforts to provide remedial services to prevent the breakup of his family, arguing that OCS failed to investigate placement with his extended family members and provided him with limited visitation and services. He also appeals the superior court's finding that termination of his parental rights was in Eva's best interests. Robin has not appealed.

### III. STANDARD OF REVIEW

 Whether OCS complied with the active efforts requirement is a mixed question of law and fact.[5] Accordingly, we review the legal issues de novo and the factual determinations for clear error.[6] A finding is clearly erroneous when a review of the entire record in the light most favorable to the prevailing party leaves us with a "definite and firm conviction" that a mistake has been made.[7] "Conflicting evidence is generally in-

---

5. *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 222 P.3d 841, 846 (Alaska 2009) (citing *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 26 P.3d 1089, 1092 (Alaska 2001)).

6. *Id.* (citing *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 259 (Alaska 1999)).

7. *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 255 P.3d 1003, 1008 (Alaska 2011) (citing *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 761 (Alaska 2009)).

sufficient to overturn the superior court, and we will not reweigh the evidence when the record provides clear support for the superior court's ruling."[8]

## IV. DISCUSSION

■ Before terminating parental rights under AS 47.10.088, the superior court must first find by clear and convincing evidence that the child is a child in need of aid under one of the grounds set forth in AS 47.10.011.[9] Second, the court must find the parent has failed to remedy the conduct or conditions placing the child at a substantial risk of harm.[10] Where the parent is incarcerated, however, the court may instead find (1) the period of incarceration during the child's minority is significant given the child's age and needs, (2) no other parent is willing and able to care for the child, and (3) the incarcerated parent failed to make adequate provisions for the child's care.[11] Third, in the case of an Indian child, the superior court must find by clear and convincing evidence that OCS made "active efforts" to provide remedial and rehabilitative programs to prevent the breakup of the Indian family.[12] Fourth, the superior court must find by a preponderance of the evidence that termination of parental rights is in the child's best interests.[13] Finally, in the case of an Indian child, the superior court must find by evidence beyond a reasonable doubt, including expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.[14]

### A. The Superior Court Did Not Err In Finding OCS Complied With ICWA's Active Efforts Requirement.

■ The superior court had previously found that OCS made active efforts at the October 2009 permanency hearing, and the parties conceded at the October 2010 termi-

nation trial that OCS had made active efforts from the time of removal in September 2008 until October 2009. Starting from this base, the court then examined OCS's efforts since October 2009, noting that Josh had no primary social worker from October 2009 to April 2010, but during that time a secondary social worker had communicated with Josh and facilitated the exchange of letters and pictures between him and Eva. When Leahu took over the case in August 2010, he had no contact with Josh but he did contact Josh's tribe and Josh's mother about possible placement options for Eva. The court observed:

> In this case, [Josh] was in jail before [Eva] was taken into custody, and he will still be there when [Eva] is an adult. The State tried to engage [Robin], the only parent available for reunification, but their efforts failed. Under such circumstances, there is not much the State could do (especially for [Josh]) to prevent the family's breakup or to reunite them.

Although the court acknowledged "OCS['s] efforts were not perfect in this case, especially regarding visitation and family contact for [Josh]," it found OCS's efforts were sufficient under these circumstances to satisfy the statutory requirements for active efforts. Josh challenges this ruling on several grounds.

#### 1. Reliance on prior findings and stipulations

As a threshold matter, Josh argues that the superior court improperly relied on its October 2009 active efforts finding, the tribe's statement that necessary services might not be available in the village, and OCS's efforts on Robin's behalf. We disagree.

Josh first argues that the superior court erred in relying on its prior active efforts

---

**8.** *Id.* at 1012 (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008)).

**9.** AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

**10.** AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i).

**11.** AS 47.10.080(*o*); CINA Rule 18(c)(1)(B); *see also Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 222 P.3d 841, 846 (Alaska 2009).

**12.** 25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B). Active efforts are required even when a parent is incarcerated. *Dashiell R.,* 222 P.3d at 846.

**13.** AS 47.10.088(c); CINA Rule 18(c)(3).

**14.** 25 U.S.C. § 1912(f) (2006); CINA Rule 18(c)(4).

finding in its termination order and in considering only OCS's efforts since October 2009 in determining whether OCS had made active efforts. But the parties conceded at the termination trial that OCS made active reunification efforts through October 5, 2009 and agreed they were not going to contest the trial court's prior active efforts finding.[15] Josh does not argue that he was prevented from challenging that finding at trial or presenting evidence on OCS's reunification efforts prior to October 2009.[16] Accordingly, the superior court did not err in relying on its prior finding and the parties' concession in its final order.[17]

Josh next argues that the superior court erred in relying on the tribe's statement that "[Eva] needed a lot of services that might not be available in the village." But the court merely noted this statement when describing the tribe's position in its overview of the case. The court did not rely on the statement in its active efforts analysis, which properly focused on OCS's reunification efforts.

Finally, Josh argues the superior court erred in relying on OCS's efforts on Robin's behalf. Robin was not present at trial and her attorney orally stipulated OCS had made active efforts on her behalf. Josh argues that the superior court erred by accepting this stipulation because it did not comply with CINA Rule 14, which requires such stipulations to be in writing and signed by the parent,[18] and that we should not rely on OCS's efforts on Robin's behalf when reviewing the superior court's active efforts finding pertaining to him. He requests that we remand with instructions to the superior court to reconsider its active efforts finding without relying on Robin's attorney's stipulation. We reject this request.

First, the superior court's order terminating Robin's parental rights did not rely on her attorney's oral stipulation, but summarized and relied on OCS's reunification efforts on her behalf. Second, the superior court properly considered OCS's efforts towards Robin in determining whether OCS made adequate efforts on Josh's behalf. In *Dashiell R. v. State, Department of Health & Social Services*,[19] we held that the superior court properly considered OCS's reunification efforts on the mother's behalf in finding that OCS had made active, though ultimately unsuccessful, efforts to reunify an incarcerated father's family and prevent the termination of his parental rights:

> [T]he superior court was correct to point to efforts OCS made regarding the mother.... In this case, had the children been able to stay with the mother, who was not incarcerated, there is no indication Dashiell's parental rights would have been terminated, because there would have been no need for the children to be placed elsewhere. As the superior court noted—and Dashiell does not contest—the [S]tate's efforts regarding the mother were "very active." We view these efforts as an important aspect of the [S]tate's active efforts to keep the family together.[20]

**15.** At the October 2010 termination trial, the superior court agreed to take judicial notice of its prior active efforts finding from the October 2009 permanency hearing. The court then asked whether any party was going to argue OCS had not made active efforts through October 5, 2009. Josh's attorney, Robin's attorney, and the guardian ad litem all said no. The court then stated, "Okay ... no one's going to contest that active efforts were[made] up till October 5, 2009." None of the parties objected.

**16.** Josh acknowledges in his briefing on appeal that the evidence presented at trial "covered the entirety of the case, not just facts that developed after October 2009, including ... actions taken by OCS throughout the case."

**17.** We reached a similar conclusion in *Nicole H. v. State, Dep't of Health & Soc. Servs.*, Mem. Op. & J. No. 1246, 2006 WL 895084 (Alaska, Apr. 5, 2006), an unpublished opinion in which we observed that the superior court was not bound by its prior active efforts finding in a termination proceeding, but it was "well within the trial court's discretion" to treat its earlier finding as presumptively binding as long as the court did not preclude the parties from presenting new evidence or arguments challenging its earlier ruling. *Id.* at *6.

**18.** CINA Rule 14 provides: "In the case of an Indian child, a stipulation to adjudication or disposition is not binding on a parent or Indian custodian unless it is in writing, agreed to in court (whether in person or telephonically), and signed by the parent or Indian custodian."

**19.** 222 P.3d 841 (Alaska 2009).

**20.** *Id.* at 850.

As in *Dashiell R.*, given Josh's incarceration throughout OCS's custody of Eva and his 99–year sentence, OCS's efforts on Robin's behalf, the one parent available for reunification, were relevant when considering OCS's efforts to reunify the family and prevent the termination of Josh's parental rights.

### 2. Placement with extended family members

■ Josh's main argument is that OCS failed to make active efforts because it did not actively investigate placement with his extended family members. He relies on our opinion in *Jon S. v. State, Department of Health & Social Services, Office of Children's Services*,[21] and an opinion from the Minnesota Court of Appeals, *In re Welfare of M.S.S.*[22]

We recently rejected this argument in *David S. v. State, Department of Health & Social Services, Office of Children's Services*,[23] holding that "ordinarily the question of whether a placement decision complies with ICWA's placement preferences will not be germane to the elements of termination because nothing in ICWA requires a consideration of the ICWA placement preferences

in the decision whether to terminate parental rights."[24]

We observed that the statutory scheme of ICWA supports this interpretation.[25] Section 1912(d) provides that any party seeking foster care placement or termination of parental rights regarding an Indian child "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[26] Section 1914 then provides that certain parties, including the parent, may challenge foster care placement or termination of parental rights by showing the action "violated any provision of sections 1911, 1912, and 1913" of ICWA.[27] Absent from this list is section 1915, which provides that in any proceeding for adoption, foster care, or preadoptive placement, preference must be given to placing the child with a relative, another member of the child's tribe, or another Indian family, unless there is "good cause" to deviate from these preferences.[28] Under this statutory scheme, "termination of parental rights may not be invalidated by showing a violation of ICWA preferences."[29]

---

**21.** 212 P.3d 756 (Alaska 2009). In *Jon S.* we listed several actions that constituted "substantial evidence" OCS had satisfied the active efforts requirement, some of which included placement-related actions. *Id.* at 764–66. We did not specifically address or hold that OCS was required to make such placement efforts to fulfill its active efforts requirement.

**22.** 465 N.W.2d 412 (Minn.App.1991). In *M.S.S.* the Minnesota court held that as part of the active efforts requirement, the state was required to investigate foster placement with the father's brother before terminating the father's parental rights. *Id.* at 418–19. The Minnesota court has since distinguished *M.S.S.* on the grounds that the father specifically requested the child be placed with his brother, offered evidence supporting the proposed placement, and the tribe endorsed the proposed placement. *See In re Welfare of Children of J.B.*, 698 N.W.2d 160, 170 (Minn.App.2005); *In re Welfare of Child of Wilson*, No. C6–02–1940, 2003 WL 21266612, at *2 (Minn.App., June 3, 2003). Here, Josh did not make and his tribe did not endorse a specific placement request, and Josh stipulated to Eva's placement in the therapeutic foster home due to her special needs.

**23.** 270 P.3d 767 (Alaska 2012).

**24.** *Id.* at 779. We recently relied on *David S.* to reject a similar argument in *Doe v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014 (Alaska 2012).

**25.** *David S.*, 270 P.3d at 779.

**26.** 25 U.S.C. § 1912(d) (2006).

**27.** 25 U.S.C. § 1914 (2006).

**28.** 25 U.S.C. § 1915(a)-(b) (2006).

**29.** *David S.*, 270 P.3d at 779. We also noted that we had previously reached a similar conclusion in decisions holding ICWA does not require consideration of placement options in determining whether termination of parental rights was in the child's best interests. *See id.* at 780 & n. 36 (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1120 (Alaska 2010); *Jacob W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1319, 2008 WL 5101809, at *8 (Alaska, Dec. 3, 2008)). Other courts addressing this issue have generally reached the same conclusion. *See id.* at 779 n. 33 (collecting cases).

We recognize that the placement preferences under section 1915 are critical to ICWA's goal of promoting the stability and security of Indian tribes and families. Section 1915 has been described by the Supreme Court as "the most important substantive requirement imposed on state courts" under ICWA.[30] But as we held in *David S.*, the issue of placement is generally distinct from the issue of providing remedial and rehabilitative services to reunify the child's family and prevent the termination of parental rights.

In *David S.* we also "recognize[d] the possibility that rare cases may exist in which OCS's early placement decisions may directly impact the ability of parents to fulfill the requirements of their case plans and thus may be part of OCS's active efforts 'designed to prevent the break up of the Indian family,'" observing that "a child's placement might affect a parent's ability to participate in remedial efforts."[31] The dissent hinges its conclusion on this premise, arguing that "this is exactly the kind of case in which OCS's placement efforts are relevant and OCS's independent duty to investigate ICWA-compliant placements overlays and at least informs, if not directs, its duty to make active efforts designed to prevent the break-up of an Indian family." The dissent explains that earlier holdings of this court indicated that incarceration alone could not constitute abandonment because it does not involve willful conduct; however, this holding was later overturned by the legislature, which determined that incarceration could constitute abandonment if certain factors are met, including that "the incarcerated parent has failed to make adequate provisions for care of the child during the period of incarceration...."[32] The dissent then challenges the superior court's finding in this case that "on a 'clear and convincing' basis ... Josh had not 'made adequate arrangements' for Eva in light of his unavailability" because Josh "contended that he 'attempted to reach out to family members for assistance' in making adequate arrange-

ments for Eva[, but] OCS failed to make active efforts to assist him." The dissent concludes that it is OCS's failure that led to Eva's continued status as a child in need of aid, not Josh's actions, because "OCS has an active-efforts duty to consider, evaluate, and take action on an incarcerated parent's request for alternative placement under ICWA's standards." We disagree.

As we identified in *David S.*, there may be cases where a "child's placement might affect a parent's ability to participate in remedial efforts," but these cases are rare and this is not such a case.[33] Given Josh's long-term incarceration, Eva's placement with one of his relatives would not have affected his ability to participate in remedial efforts or fulfill his case plan requirements. In October 2008, OCS developed a case plan for Josh; his objectives included completing assessments for mental health, anger management, and substance abuse, attending counseling to understand Eva's special needs, and engaging in Eva's therapy when she was ready. In November 2008, OCS filed a pre-disposition report, where the social worker proposed arranging calls through Josh's attorney. Additionally, Josh stipulated in January 2009 that there was "good cause" to deviate from ICWA's placement preferences and allow Eva to remain in her therapeutic foster home in Anchorage because of her special needs. By February 2009, the social worker had not heard from Josh, but was continuing to attempt to contact him. By the time of the October 2009 permanency hearing, the court found that Josh had still not made substantial progress to remedy his conduct. During this time period, Eva's placement with one of Josh's relatives would not have affected Josh's ability to work on his case plan objectives, such as obtaining an anger management or mental health assessment or attending parenting classes and engaging in Eva's therapy. Josh did not begin interacting with Eva until after this October 2009 hearing, and he did not submit his sisters as possible placements until October

---

**30.** *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36–37, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

**31.** *David S.*, 270 P.3d at 779.

**32.** AS 47.10.080(*o*)(3).

**33.** *David S.*, 270 P.3d at 779.

2009. Moreover, according to his social worker, OCS had looked into placement with Josh's parents during this time, but they had concerns about their ability to meet Eva's special needs. Finally, Josh did nothing more than suggest placement with his "sisters," without specifying a particular placement, and OCS found them all to be unsuitable as placements because they were "known to have sex offenders in the home...." Thus, it was Josh's lack of action, not OCS's failure to investigate Josh's preferred placements, that led to Eva's continued status as a child in need of aid during this time. Under these circumstances, OCS was not required to actively pursue placement with Josh's relatives as part of its active efforts to prevent the termination of Josh's parental rights.[34]

### 3. Visitation and remedial services

Josh also argues that OCS failed to make active efforts on his behalf because it did not arrange for adequate visitation between Eva and himself, made little effort to assist him with his case plan, and left him without a primary social worker for six months. In describing what constitutes "active efforts," we have said:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, [occur] where the state caseworker takes the client through the

steps of the plan rather than requiring that the plan be performed on its own.[35] No "pat formula" exists for distinguishing between active and passive efforts, and we have adopted a case-by-case approach for the active efforts analysis.[36]

Although a parent's incarceration does not relieve OCS of its duty to make active efforts, it "significantly affects the scope of the active efforts" OCS must make to satisfy the requirement.[37] We have stated "the practical circumstances surrounding a parent's incarceration—the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration—may have a direct bearing on what active remedial efforts are possible."[38] Additionally, as discussed above, OCS's reunification efforts on behalf of the non-incarcerated parent are an "important aspect" of OCS's efforts towards the incarcerated parent.[39]

The dissent believes that OCS's active efforts included a "duty to actually help Josh remedy the conditions that caused Eva to be a child in need of aid .... [and] help him make 'adequate arrangements' for Eva." Moreover, the dissent argues that "once it became clear that remedial efforts with Robin would not be successful—which occurred by July 2009 ...—OCS's active efforts should have turned to assisting Josh make adequate arrangement for Eva by investigating placement with Josh's family." The

---

**34.** Josh also challenges the superior court's best interests finding for the same reasons, arguing the court failed to consider whether placement with his extended family members was in Eva's best interests. We reject this argument for the same reasons discussed above. Additionally, we have previously rejected the argument that a superior court must consider placement options when determining whether termination of parental rights is in the child's best interests. *See Lucy J.*, 244 P.3d at 1120 ("[N]othing in ICWA requires consideration of placement options in determining whether to terminate parental rights." (quoting *Jacob W.*, 2008 WL 5101809, at *9) (internal quotation marks omitted)). Josh does not otherwise challenge the superior court's findings that termination of his parental rights was in Eva's best interests because she "needs a calm, solid and reliable environment," a home "equipped to care for her considerable needs," and that, given Josh's lengthy sentence, "[a]doption offers the best hope for stable and consistent parenting" for Eva.

**35.** *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

**36.** *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

**37.** *A.A.*, 982 P.2d at 261.

**38.** *Id.; see also Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009) (stating the circumstances surrounding a parent's incarceration "may have a direct bearing on what active remedial efforts are possible," and these circumstances include "the duration of the parent's incarceration and the services possible for incarcerated parents").

**39.** *Dashiell R.*, 222 P.3d at 843–44, 850.

dissent acknowledges the superior court's finding that Josh did not make adequate arrangements to meet Eva's needs, but that "the reality is that Josh could only fulfill this responsibility through and with the help of OCS." The dissent contends that once Josh requested OCS to consider placement with his relatives, "OCS's active efforts obligation required it to contact Josh's family to determine willingness, to undergo home studies, and to assess his family's ability to address Eva's needs."

We disagree because the dissent's analysis confuses the obligations of the incarcerated parent and OCS. While we agree with the superior court's observation that OCS's efforts in this case were "not perfect," we cannot conclude, given Josh's incarceration throughout OCS's custody of Eva and the significant length of his current sentence, that the court's active efforts finding is clearly erroneous. As the superior court noted, Josh agreed OCS had made active efforts through October 5, 2009. Although he did not have a primary social worker for six months from October 2009 through April 2010, a secondary social worker communicated with Josh during that time and facilitated the exchange of letters and pictures between him and Eva. During that time, the secondary case worker asked Josh about placement with his family and he identified his sisters as possibilities; however, after speaking with his former case worker, she was informed his sisters were not viable options because they were known to have sex offenders in the home. OCS also developed a case plan for Josh during this period and kept him informed by sending him updates and court filings. The initial case conference notes indicate Josh was to participate in available programs while in jail and complete his remaining tasks after being released. Josh was never released from jail but was instead sentenced to 99 years of imprisonment. And OCS has no authority to require the Department of Corrections to provide any assessments, treatments, or classes to an inmate.

Throughout this time, however, OCS made active efforts to facilitate Eva's reunification with Robin, "the only parent available for reunification." The dissent argues that once it became clear that Robin was not an option, OCS had a duty to contact Josh's family to determine their willingness and ability to meet Eva's needs. However, the record indicates OCS did do that before the termination trial in October 2010. By October 2009, OCS case workers already had doubts about Susan's ability to meet Eva's special needs and whether Eva could obtain adequate support services in her native village. In July 2010, OCS attempted to facilitate contact between Eva and Josh's family; it sent a newsletter from Eva and phone cards to Josh's mother and sister so they could call into her therapy sessions. However, neither relative responded. In August 2010, OCS asked Josh's tribe about possible placements with family members; again, they received no response. Since 2008, Josh expressed his desires to have Eva placed with family members; notably, none of these family members came forward and expressed their willingness to care for Eva. In fact, when OCS asked Josh's mother, Susan, about adoption in September 2010, she said "she would like to think about the placement...." But she never agreed to adopt Eva. Josh had the obligation to make "adequate arrangements" for Eva's care, which means he must identify placements with people that *are* willing and able to meet Eva's needs.[40] In this case, he failed to do so. He did nothing more than suggest relative placements, none of whom were suitable and many of whom did not even respond to OCS's overtures. Under these circumstances, we cannot say it was clearly erroneous for the superior court to conclude that OCS satisfied its duty to make active efforts to prevent the breakup of Josh's family and the termination of his parental rights.

## IV. CONCLUSION

For these reasons, we AFFIRM in all respects the superior court's order terminating Josh's parental rights.

CHRISTEN, Justice, not participating.

WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting.

**40.** *See* AS 47.10.080(*o* ).

WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting.

I respectfully disagree with the court's decision to affirm the superior court's finding that the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) made active efforts to help Josh L. remedy the conditions leaving Eva a child in need of aid and to keep this Indian family intact. I would reverse the superior court's decision terminating Josh's parental rights to Eva.

We recently recognized in *David S. v. State, Department of Health & Social Services, Office of Children's Services* "the possibility that cases may exist in which OCS's early placement decisions may directly impact the ability of parents to fulfill the requirements of their case plans and thus may be part of OCS's active efforts 'designed to prevent the break up of the Indian family.'"[1] Today the court states "this is not such a case" because "Eva's placement with one of [Josh's] relatives would not have affected his ability to participate in remedial efforts or fulfill his case plan requirements."[2] I disagree—this is exactly the kind of case in which OCS's placement efforts are relevant and OCS's independent duty to investigate ICWA-compliant placements overlays and at least informs, if not directs, its duty to make active efforts designed to prevent the breakup of an Indian family.

I begin with the fundamental notion that OCS's active efforts must be tailored to the basis for finding a child in need of aid. We "identify the problem that caused the [child] to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances."[3] This makes abundant sense—it is not sufficient when terminating parental rights for a court to find only that (1) an Indian child is in need of aid and (2) the parent failed to remedy the condition that led to the Indian child being in need of aid.[4] There also must be a finding, by clear and convincing evidence,[5] that OCS made active efforts to assist the parent in remedying the conditions that led to finding the child in need of aid, and that those active efforts were specifically designed to prevent the breakup of the Indian family.[6] This necessary bridge between a need of aid finding and a failure to remedy finding is a critical component when taking the drastic measure of terminating parental rights.[7]

OCS took custody of Eva in September 2008 when Josh was in jail awaiting trial on serious criminal charges. As to Josh, Eva was adjudicated a child in need of aid under AS 47.10.011(1) and (2), which provide that a child may be found to be in need of aid if:

(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter; [8] [or]

1. 270 P.3d 767, 779 (Alaska 2012) (quoting 25 U.S.C. § 1912(d) (2006)).

2. Per Curiam Op. at 17.

3. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 (Alaska 2010) (citing *Burke v. State., Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007)).

4. *See* CINA Rule 18(c) (listing these two findings as merely the first of four procedural steps in terminating the parent's rights to an Indian child).

5. Clear and convincing evidence is evidence producing "a firm belief or conviction about the existence of a fact to be proved." *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000) (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)).

6. CINA Rule 18(c)(2)(B) (comporting with 25 U.S.C. § 1912(d)); *see also Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009) ("[A]ctive efforts require taking a parent through the steps of a plan and helping the parent develop the resources to succeed; drawing up a case plan and leaving the client to satisfy it are merely passive efforts." (citing *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999))).

7. *See Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011) ("We bear in mind at all times that terminating parental rights is a drastic measure." (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003))).

8. AS 47.10.011(1)'s incorporation of abandonment under AS 47.10.013(a) requires a finding of a parent's "conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering

(2) a parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child[.]

Josh was convicted and in July 2009 was sentenced to serve 99 years. At the October 2010 termination trial the superior court found, with respect to Josh, that Eva was still a child in need of aid under AS 47.10.011(1) and (2).

Before examining the superior court's termination findings, it is useful to review the interplay between incarceration and abandonment under AS 47.10.011(1). In *Nada A. v. State*[9] and *A.M. v. State*[10] we determined that incarceration cannot itself constitute abandonment because it does not involve willful conduct.[11] After *A.M.*, the legislature enacted a statutory change to provide that incarceration can constitute abandonment if the incarceration is a for a significant period of time and other factors are satisfied:[12]

> For purposes of terminating a parent's parental rights ... the court may determine that incarceration of the parent is sufficient grounds for determining that a child is a child in need of aid ... and that the parental rights of the incarcerated parent should be terminated if the court finds, based on clear and convincing evidence, that

(1) the period of incarceration that the parent is scheduled to serve during the child's minority is significant considering the child's age and the child's need for an adult's care and supervision;

(2) there is not another parent willing and able to care for the child; and

(3) the incarcerated parent has failed to make adequate provisions for care of the child during the period of incarceration that will be during the child's minority.[13]

The legislature added AS 47.10.011(2) in 1998, "making clear that the change was intended to 'override [*A.M.* and *Nada*].'"[14] We subsequently stated that AS 47.10.011(2) is an additional ground OCS may rely on to terminate rights if the parent's incarceration itself is likely to injure the child in the future, but does not supplant AS 47.10.011(1) as a ground for terminating the rights of a parent who has willfully disregarded parental obligations before, during, or after that incarceration.[15] We have also continued to consider a parent's actions while incarcerated as potential grounds supporting an abandonment theory despite the statutory change.[16]

It is against this legal backdrop that I consider the superior court's express findings on Eva's child in need of aid status after the termination trial:

> At trial, [Josh] conceded that [Eva] is a child in need of aid because [Eva's] mother abandoned her and he was absent. AS 47.10.011(1)[.] [17]

the child's age and need for care by an adult." The statute also sets out several specific circumstances that would, in the absence of justifiable cause, constitute abandonment. AS 47.10.013(a)(1)-(8).

9. 660 P.2d 436 (Alaska 1983).

10. 891 P.2d 815 (Alaska 1995).

11. *See id.* at 823–24; *Nada A.*, 660 P.2d at 439.

12. Ch. 89, SLA 1996; *see also Zander P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 2007 WL 2745157, at *3 (Alaska 2007) (describing history of AS 47.10.080(*o* )).

13. AS 47.10.080(*o* ).

14. *Zander P.*, 2007 WL 2745157, at *3 (quoting ch. 99, §§ 1(b)(2)(B), 18, SLA 1998 (expressly overriding *A.M.* and *Nada* )).

15. *Rick P. v. State, OCS*, 109 P.3d 950, 957 (Alaska 2005); *see also Zander P.*, 2007 WL 2745157, at *3.

16. *See, e.g., Rick P.*, 109 P.3d at 957 (affirming abandonment finding based on father's pre-incarceration activities, but noting that father's actions during and after incarceration also demonstrated " 'willful disregard' of his parental obligations," pointing specifically to father's negative reaction to OCS's case plan while in prison and the "tone of [his] response ('I think you and your office has caused me enough stress and abuse by kidnaping my son')" as evidence that he was "not interested in participating in the case plan, and by extension, not interested in visiting his daughter").

17. The superior court overstated Josh's concession. Josh conceded that Robin had abandoned Eva and that he was absent. Josh did not concede that he had abandoned Eva under AS 47.10.013 or that Eva was a child in need of aid under AS 47.10.011(1).

The superior court failed to recognize that in the context of incarceration, abandonment under AS 47.10.011(1) requires an additional finding, by clear and convincing evidence, of a "con-

. . . .

[OCS] also claimed that [Eva] was a child in need of aid because her father was incarcerated, her mother engaged in CINA-worthy behaviors, and [Josh] did not make adequate arrangements for her care. AS 47.10.011(2).

[Josh] testified that he wanted OCS to place [Eva] with his family, but it does not appear that he made any arrangements to meet [Eva's] needs.

To be sure, [Josh] may not have had much power to act once he was incarcerated. . . .

Still, other than sending a few letters, attempting a few phone calls and talking to his attorney, there is no evidence that [Josh]—who knew first-hand that [Robin] had abandoned [Eva] "quite a few times" in the past—did anything to [e]nsure [Eva's] well-being.

As a result, the Court finds, by clear and convincing evidence, that [Eva] is a child in need of aid under the "incarceration" subsection as well. (Footnotes omitted.)

For its "failure to remedy" findings, the superior court stated:

[Robin] has still abandoned [Eva] and [Josh] is still in jail. Nothing has changed.

In addition, [OCS] has shown, by clear and convincing evidence, that (a) the period of incarceration (99 years) is significant given [Eva's] age (14) and her needs (which are pressing and substantial), (b) [Robin] is not willing or able to care of [Eva], and (c) [Josh] failed to make adequate provisions for [Eva's] care. CINA Rule 18(c)(1)(B); AS 47.10.080(o).

There can be no dispute that at the time of trial Robin was out of the picture and Josh was in jail for the rest of Eva's minority, so to the extent these findings relate to Josh's being absent and incarcerated, they certainly are correct. But something beyond incarceration is required for abandonment under AS 47.10.011(1), and the only factor addressed by the superior court on a "clear and con-

vincing" basis was that Josh had not "made adequate arrangements" for Eva in light of his unavailability. Josh contended that he "attempted to reach out to family members for assistance" in making adequate arrangements for Eva and that OCS failed to make active efforts to assist him.

Three previous cases help frame the issue. *Stanley B. v. State of Alaska, Division of Family & Youth Services,*[18] presented a similar situation in a non-ICWA context. In that case Stanley's children were taken into state custody when he was evading arrest for violations of release from prison.[19] He was caught, returned to prison, and essentially remained there for the duration of the child in need of aid proceedings (and beyond).[20] Stanley's "case plan directed Stanley to provide the names and addresses of any person he wished [DFYS] to consider for placement of the children."[21] He did so, but DFYS denied all of Stanley's initial placement preferences and placed the children with a pre-adoptive family.[22] Stanley's parental rights were terminated under the incarceration provisions of AS 47.10.080(o) and AS 47.10.011(2) because he had failed to "make adequate arrangements" for his children in light of his significant period of incarceration and the unavailability of the children's mother.[23] On appeal, we stated:

The superior court correctly interpreted AS 47.10.080(o)(3). The statute obligates the incarcerated parent—not the state—to arrange for the children's care. . . .

Stanley provided DFYS with the names of several relatives and friends with whom he wanted the children placed. The superior court found that DFYS had made "more than reasonable efforts" to consider Stanley's stated preferences. Having reviewed the record, we agree. Because none of Stanley's placement options was facially "adequate," the conditions for termination under AS 47.10.080(o) were met.

. . . .

scious disregard of parental responsibilities." AS 47.10.013. No such finding was made.

**18.** 93 P.3d 403 (Alaska 2004).

**19.** *Id.* at 405.

**20.** *Id.*

**21.** *Id.*

**22.** *Id.*

**23.** *Id.* at 406–07.

The superior court [also] found the evidence that supported termination of parental rights under AS 47.10.080(o ) (the significant period of Stanley's incarceration, the mother's unavailability, and the unsuitability of Stanley's placement proposals) was clear and convincing evidence that Sean and Sarah were children in need of aid for purposes of AS 47.10.011(2). These findings were not clearly erroneous.[24]

In a later unpublished decision involving the same non-ICWA circumstances,[25] we stated that *Stanley B.* did not actually decide whether OCS has a duty to make reasonable efforts to consider a parent's placement proposals:

> Although we mentioned the superior court's finding that DFYS had made "reasonable efforts" to consider Stanley's preferences and stated that we agreed with it, we did not hold or state that such a finding is a prerequisite to terminating parental rights under AS 47.10.080(o ). *Stanley B.* therefore did not decide whether [DFYS] must make reasonable efforts to consider a parent's placement proposals before the superior court can terminate parental rights.[26]

The final non-ICWA case with similar circumstances is *Samuel H. v. State, Office of Children's Services.*[27] In that case we said "*Stanley B.* requires incarcerated parents to take affirmative steps to arrange appropriate and feasible care options independent of department action."[28] But we also stated:

> We decline to hold that "adequate arrangements" under AS 47.10.080(c) includes the requirement that an incarcerated parent must follow a formal procedure to initiate legal proceedings to formalize arrangements made for the child and make alter-

native plans merely because the parent's plans overlap with OCS's arrangements. An arrangement is adequate if, when followed, it will provide for the care of the child.[29]

Because the incarcerated parent had testified at the termination trial as to his attempt to arrange placement with the child's grandmother and his testimony was not rebutted, we remanded to the superior court for factual findings on the parent's credibility and efforts to place the child, without comment on OCS's potential duty.[30]

Although we do not need to decide the question here, it is difficult to believe that in the non-ICWA context OCS's reasonable efforts duty does not include assisting an incarcerated parent in remedying the lack of an alternative placement for a child when the parent provides the names of potential placements. OCS and the superior court certainly thought there was such a duty in *Stanley B.*[31] This makes sense—OCS has legal custody of the child and cannot simply hand the child over to whomever the incarcerated parent arranges to come get the child for informal placement during the child's minority. What can an incarcerated parent do other than propose names for OCS's consideration? If OCS determines the proposed placements are unacceptable and, if necessary, proves that at trial, then the parent has not made adequate arrangements. If OCS finds a proposed placement acceptable, the CINA proceedings may be over.

This, however, is an ICWA case, and the standard is not reasonable efforts to reunite a family. OCS is required to make active efforts to prevent the breakup of an Indian family.[32] In my view OCS has an active-

**24.** *Id.*

**25.** *Randy P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 2005 WL 3006601 (Alaska, Oct. 19, 2005).

**26.** *Id.* at *4 (footnotes omitted). We did not decide the question in that case, either, stating that if the state had such a duty, it was fulfilled given the parent's unsuitable placement preference. *Id.*

**27.** 175 P.3d 1269 (Alaska 2008).

**28.** *Id.* at 1273.

**29.** *Id.* at 1274.

**30.** *Id.* at 1274–75.

**31.** 93 P.3d 403, 406–07 (Alaska 2004) (recognizing that OCS "should not disadvantage an incarcerated parent by blocking his efforts to make 'adequate' provisions for his children").

**32.** *Compare* CINA Rule 18(c)(2)(A) (requiring reasonable reunification efforts), *with* CINA Rule

efforts duty to consider, evaluate, and take action on an incarcerated parent's request for alternative placement under ICWA's standards. This may remedy the child in need of aid condition that the parent has not made "adequate arrangements" for the child during the parent's incarceration. My view is buttressed by the fact that OCS already has a separate and independent ICWA duty to give a placement preference, not only for adoptive but also for any foster care or pre-adoptive placement, first to "a member of the Indian child's extended family," and then to other specified placements.[33] Moreover, "[w]here appropriate, the preference of ... the parent shall be considered";[34] and "[t]he standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties."[35] The United States Supreme Court has characterized placement preferences as "[t]he most important substantive requirement imposed on state courts."[36]

A primary objective of section 1915(d) is to prohibit state courts from imposing value judgments on proposed foster care placements based on the prevailing social and cultural standards of the non-Indian community, much in the same way state courts are prohibited from removing Indian children from their homes based on the prevailing child-rearing norms in the non-Indian community.[37]

In this vein, ICWA preferences may even control over state law standards for child placements:

In certain circumstances, a relative who is otherwise entitled to a placement preference under the ICWA may be disqualified under state law because of a prior history of neglect or abuse toward another child. At least one court has held, however, that the ICWA preferences may override some state disqualification if the relative placement can demonstrate no harm would befall the child.[38]

In this context, then, OCS's ICWA-placement duty overlays its active efforts duty; the court is wrong to say that OCS's ICWA-placement duties have no relevance to its active efforts duties when lack of adequate placement is itself the basis for finding a child in need of aid. In evaluating OCS's active efforts to prevent the breakup of this Indian family, we must ask: Given that Josh

18(c)(2)(B) (requiring active reunification efforts in Indian child cases).

**33.** 25 U.S.C. § 1915(b) (2006).

Under ICWA, the law or custom of the Indian child's tribe defines the extended family member. In the absence of tribal law or custom, "extended family member" is defined as a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. 25 U.S.C. § 1903(2). By rejecting the limited nuclear family of state law as the group of persons eligible for child custody, the extended Indian family definition remedies the cultural gap between tribes and non-Indians that was evident during the legislative process. H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 10, 11, 20, 24 (1978); 1978 U.S.C.C.A.N. 7530 at 7532, 7533, 7543, 7546. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 11.05[2], at 842 n. 168 (Nell Jessup Newton ed., 2005 ed.) (hereinafter COHEN'S HANDBOOK).

**34.** 25 U.S.C. § 1915(c) (2006).

**35.** 25 U.S.C. § 1915(d) (2006).

**36.** *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

**37.** B.J. JONES, MARK TILDEN, & KELLY GAINES-STONER, THE INDIAN CHILD WELFARE ACT HANDBOOK 135 (2d ed.2008).

**38.** *Id.* at 137 (citing *In re Jullian B.*, 82 Cal. App.4th 1337, 99 Cal.Rptr.2d 241 (2000)) (footnote omitted); *see also* COHEN'S HANDBOOK § 11.05[2], at 843 ("ICWA preferences replace preferences under state law, which tend to be more subjective and variable.").

ICWA also requires that OCS make a record of its Indian child placements, "evidencing the efforts to comply with" ICWA's placement preferences. 25 U.S.C. § 1915(e) (2006); *see State ex rel. C.D.*, 200 P.3d 194, 212 n. 31 (Utah App. 2008) ("ICWA expressly requires that a record be created that documents the attempts to place the children in compliance with the ICWA preferences."). And at each hearing where the court authorizes the initial or continued removal of an Indian child from the child's parent, the superior court "shall inquire into and determine" whether OCS has complied with ICWA's placement preferences. CINA Rule 10.1(b).

was incarcerated and Robin was unavailable to parent Eva, what did OCS do to assist Josh with an appropriate case plan to make other "adequate arrangements" for Eva so she would no longer be a child in need of aid and the case could be resolved without terminating Josh's parental rights? In my view the answer is: Nothing. Why does it matter? Because if OCS had made active efforts to contact and consider the small universe of Josh's parents and six sisters, as he repeatedly requested, as OCS repeatedly obligated itself to do in its case plans, and as OCS was otherwise obligated to do under ICWA's placement provisions, a satisfactory placement might have been made for Eva's normal supervision that would have satisfied Josh's "adequate arrangements" obligation.[39] Contrary to the court's suggestion, Eva then would no longer have been a child in need of aid and there would have been no basis to terminate Josh's parental rights and break up this Indian family.[40]

The facts of this case are that OCS took emergency temporary custody of Eva in late September 2008, when Josh was incarcerated awaiting trial on serious criminal charges. Josh's initial case conference with OCS was on October 14. OCS's conference record reflects that: Josh's tribe had already provided the name and telephone number of a possible placement; the social worker had found that number did not work; and Josh provided a correct number and also suggested a sister as a possible placement. A few days later Josh's tribe intervened and formally requested that OCS contact Josh's parents as a potential placement for Eva; their names and contact information were provided to OCS.

OCS's October case plan, setting family reunification as Eva's permanency goal, reflected that a "relative search is in progress" and the social worker "is sending letters to the tribe asking for family [placements]."

Josh's duties under the case plan included completing mental health, anger management, and substance abuse assessments and following the recommendations. He was tasked with receiving sexual abuse counseling and treatment. Because of Josh's limited contact with Eva and his lack of understanding regarding her special needs, he also had a duty to engage in counseling and parenting classes to understand Eva's needs and to engage in her therapy when she was ready for his participation.

OCS's November predisposition report stated that Eva's current placement was not ICWA-compliant but that good cause existed for the deviation as Eva was in a therapeutic foster home with Robin's consent. OCS stated that the social worker "will be speaking with relatives that are named by either parent ... to consider them as a possible placement." OCS stated its awareness that Josh's parents wanted to be considered for placement, but that the social worker was "looking into some history on them" and obtaining documents regarding concerns. OCS stated that although Josh supported Eva's current placement because of her needs, he "also wants some of his family considered" for placement. OCS also noted that the social worker "will be looking into family requested when [Eva] is ready to be discharged from the therapeutic foster home."

OCS's February 2009 case plan contained the exact same wording as the October case plan with respect to considering Josh's family members for placement—a "relative search is in progress" and the social worker "is sending letters ... asking for family." It also stated that the social worker "is continuing to look for family placement." The case plan contained no changes to Josh's duties and objectives.

OCS's March 2009 case plan changed Eva's permanency goal to adoption with fam-

---

**39.** OCS's remedial efforts "need not be limited to formal programs of treatment. For example, a proposal to place a child with an extended family member can be a remedial and rehabilitative measure." COHEN'S HANDBOOK § 11.05[1], at 841 (citing *In re Welfare of M.S.S.*, 465 N.W.2d 412 (Minn.App.1991)); *see also Samuel H.*, 175 P.3d at 1274–75 (discussing adequacy of arrangements made by an incarcerated parent).

**40.** Had Josh's parents or his sisters been willing and capable of adopting Eva, then Josh may have been able to reserve some parental rights in the process rather than having all of his parental rights terminated at trial. *See* AS 47.10.089 (providing that in a voluntary relinquishment of parental rights a parent may retain some privileges with regard to the child, including visitation and communication).

ily reunification as a concurrent goal. That plan also contained the exact same wording as the October and February case plans with respect to the social worker's efforts to contact and consider Josh's family members as possible placements: a "relative search is in progress," the social worker "is sending letters ... asking for family," and the social worker "is continuing to look for family placement." The case plan listed no duties or objectives for Josh to complete. In fact, Josh was eliminated as a participant in this case plan. To the extent Josh had a case plan, it was the February 2009 case plan; no later case plan for Josh can be found in the record.

In June 2009 the social worker warned Robin that her parental rights would be terminated if she failed to make progress on her case plan, indicating OCS was "no closer to bringing [Eva] home." Again in July 2009 the social worker warned Robin that "time [was] running out" because she had not made progress on her case plan and had not been in contact with Eva.

Also in July Josh was sentenced to serve 99 years for his criminal conviction, but OCS made no changes to his February 2009 case plan. In October 2009 Josh's attorney sent the social worker an email regarding relative placement with Josh's six sisters.

At trial the initial primary social worker stated that by October 2009 she had only investigated placement with Josh's parents, testifying generally that she "had some concerns about their ability to parent [Eva] with her special needs in the village, and I just didn't think that they would be able to take care of it." No testimony or contemporaneous evidence was offered indicating the extent of the investigation of Josh's parents or the specific nature of OCS's concerns.[41] Also in October 2009, the social worker learned that one of Josh's parents planned to travel to Anchorage and wished to visit Eva. The social worker acknowledged at trial this visit could have been used to assess placement with Josh's parents, but she was not sure if the visit occurred. That social worker transferred to a different OCS office a few days later without following up on placement with Josh's parents or sisters.

No primary social worker was assigned to Josh for six months until April 2010. A secondary social worker wrote to Josh several times offering a chance to communicate with Eva. Josh wrote back and began sending Eva letters and pictures. The secondary social worker also sent Josh letters from Eva, pictures of her, and some of her recent schoolwork.

In April 2010 the secondary social worker asked Josh about possible relative placements for Eva and he again identified several sisters. The secondary social worker testified at trial that she had contacted the former primary social worker and was told the sisters were not viable placement options because "they [had] previously been known to have sex offenders in the home." But the record contains neither evidence indicating a basis for the former social worker's statements, nor any contemporaneous evidence of placement investigations of Josh's sisters;[42] in fact, the former primary social worker testified at trial that she had not followed up with Josh's request to have his sisters considered for placement.[43]

Also in April 2010 Josh was assigned a new primary social worker, but there is no record of any communication between her and Josh or of any placement investigations by this social worker. That same month, OCS petitioned to terminate Josh's parental rights. In August 2010 a different primary social worker was assigned to Josh. This primary social worker also had no contact with Josh. In September 2010, the month preceding the termination trial, this social worker met with Josh's mother and a sister about conducting an adoption study. But by the time of the trial, a home visit had not been arranged to determine whether the mother or sister could adequately provide for Eva's needs.

Trial was held in October 2010. The record is indisputable that from October 2009 until the termination trial no primary social

---

41. Cf. 25 U.S.C. § 1915(e) (requiring OCS to make a record "evidencing the efforts to comply with" ICWA's placement preferences).

42. Id.

43. The court nonetheless maintains that none of the sisters "were suitable" for placement.

worker communicated with Josh. No evidence in the record documents that: (1) OCS actually attempted to meet its stated dispositional and case plan duties to "send letters" regarding family placement or "speak[ ] with relatives ... named by [Josh] ... to consider them as a possible placement"; (2) OCS made any effort to contact or consider Josh's parents for placement until shortly before the termination trial; (3) OCS actually had any "concerns" about placement with Josh's parents; or (4) OCS ever made any effort to contact Josh's sisters for placement consideration.[44] Despite these facts, the superior court found by clear and convincing evidence that OCS had satisfied ICWA's active-efforts requirement:

> In this case, [Josh] was in jail before [Eva] was taken into custody, and he will still be there when [Eva] is an adult. [OCS] tried to engage [Robin], the only parent available for reunification, but their efforts failed.

> Under such circumstances, there is not much [OCS] could do (especially for [Josh]) to prevent the family's break-up or to re-unite them.

> OCS' efforts were not perfect in this case, especially regarding visitation and family contact for [Josh].

> The Court still finds, however, by clear and convincing evidence, that OCS efforts were active enough to meet the statutory requirements.

The superior court did not even address placement until its "best interest" finding:

> [Josh] does not want to lose [h]is daughter, and claims that it is *not* in [Eva's] best interests to terminate his parental rights. He wants [Eva] to be with his family in the village (not with someone else in Anchor-

age). [Josh] fears that his voice will be lost if his parental rights are terminated.

> This argument, however, goes more to placement than termination. [Josh] was in jail when OCS took [Eva]. He will remain in jail far into her adulthood. [Josh] knows that, no matter how well he cared for her when she was young or how much he still loves his daughter, it is now impossible for him to parent his own child.

Given the facts and circumstances of this case, I must conclude that the superior court misapplied ICWA and that its active efforts finding was clearly erroneous. I conclude that OCS's efforts, in their entirety, failed to fulfill its statutory duty to actually help Josh remedy the conditions that caused Eva to be a child in need of aid. In short, OCS failed to meet its own case plan responsibilities to consider Josh's family members for placement, failed to create a relevant case plan for Josh after July 2009, failed to have a primary social worker even assigned to Josh for six months, failed to have a primary social worker contact Josh for a year, and failed to investigate placement with Josh's family to help him make "adequate arrangements" for Eva.[45] Although OCS properly directed its initial efforts towards reunifying Eva with Robin,[46] once it became clear that remedial efforts with Robin would not be successful—which occurred by July 2009 and near the same time it became clear Josh would be incarcerated for the duration of Eva's minority—OCS's active efforts should have turned to assisting Josh make adequate arrangements for Eva by investigating placement with Josh's family.

The superior court stated that although Josh "wanted OCS to place [Eva] with his family, ... it does not appear that he made

---

**44.** *Id.*

**45.** I fail to see how developing and sending a limited number of case plans that OCS itself failed to follow is anything but passive, as opposed to active, efforts. And there is a clear disconnect between OCS's failure to create a relevant, placement-oriented case plan for Josh after July 2009 and the court's conclusion that placement efforts would not have been relevant to "fulfill[ing] his [February 2009] case plan requirements," when that plan consisted of no longer relevant parenting-oriented duties.

**46.** *See Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009) (holding superior court's active-efforts finding as to the father properly considered OCS's reunification efforts with the mother because the father was incarcerated and had their efforts with the mother been successful "there would have been no need for the children to be placed elsewhere").

any arrangements to meet [Eva's] needs." This reasoning confuses both the burden and extent of efforts required by ICWA where one parent is incarcerated and the other has abandoned the child. Josh certainly had the ultimate responsibility to make adequate arrangements for Eva's care. But the reality is that Josh could only fulfill this responsibility through and with the help of OCS. OCS had custody of Eva and any possible family placement would require either OCS's approval or a court order overriding OCS's objection. Josh requested that OCS consider placement with his parents and sisters. OCS obligated itself in its own case plans to consider these placement proposals. Having made these requests, there was little else Josh could do—OCS's active efforts obligation required it to contact Josh's family to determine willingness, to undergo home studies, and to assess his family's ability to address Eva's needs.[47] To conclude otherwise lowers OCS's burden to merely requiring passive efforts,[48] and completely ignores OCS's independent, but overlaying, duty to investigate ICWA-compliant placements. Here both the tribe and Josh requested that OCS consider Josh's family members for placement and OCS was required by ICWA to do so.

Placement with a family member would have satisfied Josh's requirement to make adequate arrangements for Eva's care, eliminating Eva's status as a child in need of aid

and possibly saving Josh's parental rights from termination. But OCS made no effort, let alone active efforts, to consider and evaluate Eva's placement with Josh's family members.[49]

I would reverse the superior court's termination order and remand for OCS to make active efforts to assist Josh in making adequate arrangements for Eva's care by investigating placement with his family members, as he had repeatedly requested. If those efforts determine that none of Josh's family members are willing, qualified, or capable of caring for Eva, then OCS could initiate proceedings to terminate Josh's parental rights because he has failed to make adequate arrangements for her care.

---

47. In distinguishing *In re Welfare of M.S.S.*, 465 N.W.2d 412, 418–19 (Minn.App.1991), the court suggests Josh was not sufficiently specific in his placement request. The Minnesota court in *M.S.S.* held that the state was required as part of the active-efforts requirement to investigate placement with the father's brother. *Id.* The court should not excuse OCS's failure to consider and investigate Josh's parents and six sisters after Josh and his tribe made repeated requests and OCS obligated itself to perform the investigations.

48. *See Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009) ("[A]ctive efforts require taking a parent through the steps of a plan and helping the parent develop the resources to succeed; drawing up a case plan and leaving the client to satisfy it are merely passive efforts.").

49. The court supports its decision in part with Josh's January 2009 stipulation that there was "good cause" to deviate from ICWA's placement preferences and allow Eva to remain in her An-

chorage therapeutic foster home. This argument is flawed for two reasons. First, we have stated in an unpublished decision that:

> When a parent participating in the pre-termination phases of a CINA proceeding stipulates to accept as established ... an element of the state's case, it does not seem fair to assume that this willingness to go along for the time being was meant to preclude the parent from contesting the issue if it later becomes important at a termination hearing—a stage of proceedings when the ultimate threat of permanently losing parental ties is directly raised.

*Nicole H. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S–11974, 2006 WL 895084, at *6, (Alaska, Apr. 5, 2006). Second, and more importantly, OCS had noted that despite Josh's stipulation he still wanted his family considered for placement and OCS had obligated itself to do so. Josh's stipulation and reliance on OCS's unfulfilled promise should not now be a factor held against him.